Leah E. Clawson, as Administratrix of the Estate of Gardner C. Clawson, Deceased, Appellant, *v.* Central Hudson Gas & Electric Corporation, Respondent.

Argued October 5, 1948; decided November 24, 1948.

*John J. Scully* and *James H. Hyer* for appellant. I. The case was properly presented to the jury as a question of fact and the verdict of the jury was amply supported by the evidence. II. When the defendant erected the new dam, it created a condition which detracted from the safety of a traveler on the highway and, therefore, it created and maintained a nuisance. (*Klepper* v. *Seymour House Corp.*, 246 N. Y. 85; *Tremblay* v. *Harmony Mills*, 171 N. Y. 598; *Beck* v. *Carter*, 68 N. Y. 283; *Taylor* v. *City of Albany*, 239 App. Div. 217, 264 N. Y. 539; *Khoury* v. *County of Saratoga*, 267 N. Y. 384.)

*Andrew J. Cook* for respondent. No liability on the part of the defendant has been established. (*Weis* v. *Long Island R. R. Co.*, 262 N. Y. 352; *Conklin* v. *New York, Ontario & Western Ry. Co.*, 102 N. Y. 107; *Bellinger* v. *New York Central R. R. Co.*, 23 N. Y. 42; *Pierce* v. *New York Central R. R. Co.*, 260 App. Div. 295, 284 N. Y. 754; *Isaac* v. *Town of Queensbury*, 244 App. Div. 14; *Bove* v. *Donner-Hanna Coke Corp.*, 236 App. Div. 37; *Green* v. *City of Mechanicville*, 269 N. Y. 117; *Hearst* v. *New York Central & Hudson River R. R. Co.*, 215 N. Y. 268; *Bennett* v. *Long Island R. R. Co.*, 181 N. Y. 431; *Sheehan* v. *New York Central R. R. Co.*, 254 App. Div. 386; *Reiss* v. *Town of Pelham*, 53 App. Div. 459.)

CONWAY, J. On an evening in January, 1946, the decedent, a farmer, set out in his automobile from his home to attend a meeting at the Greenville Masonic Lodge. It was a clear night and the roads were dry. On his way he crossed the Woodstock bridge which spans Catskill Creek and is located on the State system of highways and known as Route No. 32. (See Highway Law, §§ 230, 340, 341, subd. 19.) The bridge at that time was dry. At the conclusion of the meeting, some of those who

had been present commenced the return journey to Athens in three automobiles. The decedent drove the second one. About seven or eight miles from Greenville, the automobiles approached again the Woodstock bridge. The driver of the first automobile, one Haeussler, slowed down as he approached. As he went upon the bridge, his car skidded on the ice and swerved from left to right, but he was able to pull out of the skid and to proceed. Decedent in the second car also slowed down. As his automobile went upon the bridge, it went into a skid, turned sideways at a severe angle and as it came off the bridge and reached dry ground, it rolled over and the decedent was killed.

Occupants from the automobiles testified that at the time of the accident the bridge was covered with a sheet or " glaze " of ice, caused by the freezing of spray and mist produced by the operation and maintenance of a dam by the defendant and that mist and spray were in the air at the time. A State highway employee, who was called to the scene to sand the highway after the accident, and one Bishop, who lived in the vicinity and happened to be passing by, also testified as to the ice formation on the bridge and the mist and spray in the air from the dam at the time of the accident. There was also ice from the mist and spray upon one or both of the approaches of the bridge.

Both the dam of the defendant, as presently constructed, and the highway bridge replaced older and similar structures, although the highway system antedated, of course, the dam. In 1906, when the present dam was built by the predecessors of defendant, it replaced a wooden dam which had been ten feet lower and had been farther away from the bridge. It was then constructed as a reinforced concrete structure of a patented type known as an Amburson dam. At that time the highway bridge was of iron truss construction with a wood planking floor. Subsequent to 1906, mist and spray from the present dam fell upon that bridge, but ice did not then form upon it as it now does on the present bridge, construction of which occurred in 1929 and 1930. The new bridge occupied approximately the same position as the old one — the axis was the same but one end was shifted seven feet nearer the dam and consequently the other end was an equal distance farther away from the dam. The bridge is of steel with a concrete roadway, 161.5

feet long and 22 feet wide. The dam is adjacent to the bridge with its south end 98 feet from the bridge and with its north end 289 feet from the north end of the bridge. The width of the spillway across the top of the dam is 146 feet and the drop of the water over the spillway to the base of the dam is 25 feet. The top of the spillway, over which the water flows, is 1.7 feet higher than the roadway of the bridge. From the spillway the water drops and strikes an " apron " — a ledge extending downward and outward.

It is not disputed that the fall of the water over the dam causes mist and spray to rise in the vicinity of the bridge. This mist and spray settles upon the bridge and its approaches and, when the temperature is low, forms ice thereon. Thus, at times, there will be ice on the bridge when the surrounding roads and highways are clear of ice. It is not seriously disputed that the dam as presently maintained is dangerous because of the spray therefrom which, at times, freezes upon the bridge. Defendant takes the position that the blame for that condition is upon the State highway authorities. Thus, defendant argues: " So, in the instant case, the dam was dangerous only when the bridge was not sanded by the highway authorities " and urges that the proximate cause of the nuisance was the independent action or omission of a third party over whom the defendant had no control. Defendant contends that " the undisputed proof is that the dam was no source of danger to anyone prior to 1929. It was the action of the state highway authorities, of that year, in replacing the old bridge by a new one, of colder road surface, that created the icy condition which caused the accident in question. Also * * * this was an action which the defendant was ' legally powerless to prevent, and which it was without authority to supervise and direct.' "

The action here is brought by decedent's widow as administratrix to recover damages for his wrongful death. Her complaint alleges in substance that the maintenance of the dam by defendant in such close proximity to the bridge and under such circumstances that spray fell and formed ice upon the bridge and highway, constituted a nuisance which caused the death of her husband. The complaint states a cause of action. In *Khoury* v. *County of Saratoga* (267 N. Y. 384), the local governmental

authorities built and maintained a bridge near a natural water-fall. The county was held to be liable to plaintiffs who sustained injury when the automobile in which they were riding skidded on ice formed on the bridge by spray from the falls. We said (pp. 389–390): "* * * The continued gathering of ice from spray, not rain or snow, so that this was the only dangerous spot on the highway, was a condition the authorities had faced for some years and had done nothing about it. That it was danger-ous to the public at such times is evident and amply proved. *Was it a public nuisance? This was a question of fact for the court or jury.*" (Emphasis supplied.) The trial court sub-mitted the instant case to a jury upon this basis and there were no exceptions to the charge and no requests to charge were made. Thus, if a prima facie case was established there must be a new trial.

We return now to the contention of the defendant that it was the action of the State highway authorities in replacing the old bridge with a new one, which defendant was without power to prevent, to supervise or to direct, that created the icy condi-tion which resulted in the accident. We find that position untenable.

In the first place, it is the *continuing* duty of the defendant so to operate its dam that it does not make dangerous or obstruct the public highway of which the bridge is a part. It is one of the fundamental principles of the common law that no private interference with or purpresture in or upon the public highway will be tolerated. The *continuing* duty is placed upon abutting and adjacent landowners so to use their property as not to impair the free and safe passage of the road. The defendant in the instant case has here been found to have violated that duty by maintaining its dam in such a way that spray therefrom forms ice upon the bridge and the approaches thereto and creates a dangerous condition for users of the highway. It matters not if the dam, when it was originally constructed, was not as dangerous as it is now or that the action of the State in building a new bridge has increased the danger. Nor would it matter if the dam, when it was originally constructed had been no source of danger to persons using the adjacent highway. Even if we assume *arguendo* that the defendant's dam at the

time of its erection was not dangerous in relation to the highway, it may have become dangerous by reason of the changing circumstances in the development of the locality. The right and duty of the State to improve the public highway may not be questioned, and, with the advent of motor cars and trucks, such improvements obviously became a vital and imperative necessity for the people of the State. No adjacent or abutting owner by building a dam with or without the approval of a State agency may fix as of that time, for all time, the method of constructing State highways and bridges adjacent thereto. In the instant case, the substitution of a steel bridge with a concrete deck for an iron truss bridge with wood plank flooring was without doubt in response to the growing need and demand of the users of the public highway. The defendant had always been under the duty to maintain its dam in such a manner that it would not interfere with or endanger safe passage on the adjacent highway. It was not permanently relieved of that duty by the construction of the new highway bridge. After 1930, defendant's duty had to be discharged in the light of the changed conditions. No landowner may expect the area surrounding his property to remain in a static condition. Times change and responsibilities change with them. The *extent* of defendant's duty increased with the development of the community, but the duty itself was always present and may not be shifted to the State.

We recently considered an analogous problem in *Sturman* v. *New York Central R. R. Co.* (280 N. Y. 57). There, the predecessor of the defendant had built a bridge across the railroad right of way. The bridge was 20 feet wide — the same width as was the adjacent pavement of the road at that time. Later, the pavement was widened by the State to 27 feet and at either approach to the bridge the pavement was tapered so as to adjust it to the 20-foot width of the bridge. Plaintiff, who was a passenger in a car which crashed through the side railings of the bridge, sued the railroad, contending that, in the changed terrain, the structure and location of the bridge made it a menace to the travelers on the highway in the nighttime. The railroad defended upon a ground strikingly similar to defendant's contention in the case at bar, viz., that the bridge was rendered

inadequate or dangerous through no act or default on the part of the railroad, but through the action of the State in widening the road. We held that the burden upon the defendant to maintain a useful and safe overpass under the Railroad Law "is a continuing duty of restoration, maintenance and care and within limits requires railroad corporations *to make such alterations* of their highway appurtenances as from time to time become necessary to the public safety and convenience *in keeping with regional developments* and growth of traffic." (P. 61, emphasis supplied.) The same continuing duty is upon the defendant in the instant case by common law.

In the second place, the evidence upon which the defendant bases its conclusion that the dam was not dangerous prior to 1929, is slim. The *only* testimony on the point was given by *defendant's witness,* Wilsey, as follows:

"Q. Now on those occasions when there was freezing weather and there was spray and mist from the stream and falls, did you ever see any ice on the floor of the bridge? A. *Not as I recall, no.*

"Q. Now after this bridge [the old bridge] was removed and the new bridge was constructed there did you have occasion to cross that? A. Oh, yes.

"Q. How often? A. Well, the same, maybe about two, three times a day.

"Q. And did you observe whether or not in cold weather during freezing weather there would be ice upon the bridge? A. Oh. yes.

"Q. There would be from the spray that arose from the stream and falls, is that right? A. Yes.

"Q. *You didn't see that condition before the new bridge?* A. *No.*

"Q. But since that new bridge has been constructed there you have seen this spray? A. Yes.

"Q. And mist? A. Yes.

"Q. And you have seen it form ice upon the floor of the bridge, is that right? A. Yes." (Emphasis supplied.)

The defendant proceeds from the fact that Wilsey did not *see* ice form on the old bridge to the inferred fact that the structure and location of the old bridge were such that the spray and mist

from the dam did not freeze thereon. We doubt that such testimony on behalf of defendant, standing alone, is sufficient to support such an inference, even though the testimony is uncontradicted. There is no proof that ice would form less readily upon a wood planking floor than on a concrete floor, but the defendant assumes that to be the case. Moreover, there was evidence that the spray and mist from the dam formed ice upon the highway off the bridge as well as upon the highway on the bridge itself. The dangerous condition that existed because of this ice upon the highway off the bridge must obviously have existed even before the present bridge was constructed in 1929–1930. Ice upon the highway off the bridge is just as dangerous and just as great a nuisance as ice upon the highway on the bridge. The defendant cannot shift the responsibility to another for its conduct in depositing freezing spray and mist on the highway off the bridge, since that violation of its duty is clear, irrespective of the bridge's location and mode of construction.

The defendant also contends that its dam is *authorized by governmental authority,* in its present location, and cannot, without proof of negligence, be deemed a public nuisance. It is a sufficient answer to this contention that the record nowhere indicates that defendant's dam was ever inspected or approved by any governmental authority, that its plans and specifications were ever submitted for such approval, or that it has received specific authorization to locate the dam in that particular position or to raise it. However, even if the dam and its site had been so approved, the defendant company would not be relieved thereby of liability for maintaining a public nuisance. (*McGettigan* v. *New York Central R. R. Co.,* 268 N. Y. 66.) There, the plaintiffs were injured when their automobile struck the base of a signal apparatus which the defendant had placed in the center of the road adjacent to its railroad tracks at a grade crossing. The defense was that the particular position and structure of the signal had been authorized and approved by an order of the Public Service Commission. We held the defendant liable, saying (p. 71): "The problem, it may be observed again, is to settle by construction the limits of the orders of the Public Service Commission. The doctrine that what the law specially sanc-

tions cannot itself be wrongful has been narrowly applied in this court: ' We need not discuss the cases, or consider how broadly the doctrine should be permitted to operate, since one condition or limitation has been firmly grafted upon it, which raises the final and ultimate question in the case before us. That limitation is that the authority which will thus shelter an actual nuisance must be express, or a clear and unquestionable implication from powers conferred, should be certain and unambiguous, and such as to show that the legislature must have contemplated the doing of the very act in question.' (*Hill* v. *Mayor of City of New York,* 139 N. Y. 495, 501, 502.) . (See 1 Street on The Foundations of Legal Liability, pp. 41–45.) ''

The judgments of the Appellate Division should be reversed and a new trial granted, with costs to the appellant to abide the event.

LEWIS, DESMOND, DYE and FULD, JJ., concur; LOUGHRAN, Ch. J., taking no part.

Judgments reversed, etc.