Frank Sweet et al., as Sole Administrators De Bonis Non of the Estate of Levi Sweet, Deceased, Claimants, v. State of New York, Defendant.   (Claim No. 28812.)

Court of Claims, May 13, 1949.

*Richard B. Conley* for claimants.

*Nathaniel L. Goldstein, Attorney-General* (*Donald C. Glenn* of counsel), for defendant.

GORMAN, J. New York State Highway Route 167 runs generally southerly from the city of Little Falls, intersecting Route 5--S about two miles from the city line. At the point where the accident occurred, a short distance from the city line, the highway runs generally east and west, and for descriptive purposes during the trial, the latter direction was adopted. The State road was constructed in 1922–23, and is a 16-foot reinforced concrete highway. Plans for the construction of the roadway,

which was built with the aid of Federal funds, were approved by the United States Government, and the work was designed and completed in accordance with then existing good engineering practices. Flint Avenue, in the city of Little Falls, leads into Route 167 at the city line. The city street is 18 feet wide between bordering curbs, 6 inches high. The curbs at the city line are replaced by the road shoulders of the State highway, which vary in width from 4½ to 6 feet. At the city line the State highway is also 18 feet in width, but over a distance of 100 feet gradually diminishes a foot in width on either side to the 16 foot highway width. The highway in this location is substantially level and straight except for a slight curve which does not materially affect sight distance.

Adjacent to the southerly side of the highway are situated several houses and appurtenant buildings, one of which is the Levi Sweet home. This building is located approximately 60 feet west of the city line and a narrow porch on the front of the building stands but 11 feet from the southerly edge of the pavement. On the opposite or northerly side of the highway right of way, the terrain from the shoulder's edge drops sharply in elevation an average of approximately 5 feet to the railroad right of way paralleling the highway. Along the northerly shoulder running from the Little Falls boundary line for about 350 feet, the State has placed a guardrail consisting of concrete posts and two steel cables on metal brackets situated 2½ feet from the surfaced portion of the highway.

The power lines servicing this area and maintained by the Central New York Power Corporation are carried on poles approximately 26 feet above the surface of the ground. The lines, two 2,000 volt wires and two 110 volt wires, as they leave Little Falls run westerly to pole No. 37 situated in front of the Sweet residence 68 feet from the city line; thence across Route 167 diagonally to pole No. 38 situated on the northerly side of the highway 225.4 feet from pole No. 37, and continuing then westerly paralleling the highway on its northerly side. Pole No. 38, 12 inches in diameter, was installed in 1936, set in rock 2½ feet northerly of the concreted surface of Route 167, 5 feet 6 inches of its length being underground, 29 feet 6 inches above. It was in good and sound condition previous to the occurrence of the accident. A five-sixteenth inch twisted steel guy wire extended from a point 18 inches from the top of this pole to a point on the next westerly pole No. 39, an estimated 10 or 15 feet above the ground. The location of the pole No. 38 is shown on claimants' Exhibit 6, placed substantially the same distance

from the paved portion of the highway as the guardrail posts, and in back of the guardrail cables.

The gravamen of the claim rests in the assertion that the highway in question was unsafe for the traveling public. The claim is for damages for the wrongful death of Levi Sweet and for pain and suffering and other damages antedating his death on account of the alleged negligence on the part of, and nuisance maintained by the State of New York in allowing a pole carrying high voltage electric wires to be maintained " dangerously close " to the concreted surface of a State highway. It is further alleged that the State was negligent in maintaining an inadequate guardrail; in the maintenance of the shoulder adjacent to the highway; in failing to erect warning signs and traffic markings; and in failing to maintain a road of sufficient width. Claimants do not assert the presence of an abstract danger in the mere existence of the pole in question, but predicate purported liability upon the general situation.

It is undisputed that Levi Sweet died by electrocution on July 24, 1947, when certain of the above wires carrying a heavy voltage of electricity came in contact with his body.

At about 12:50 P.M. on that day, which was fair and clear, Charles Foley, an employee of the Ralston Purina Company, left the feed store of that company to make deliveries in the town of Little Falls. He was driving a 2½ ton International truck carrying a load of either 2½ or 5 tons of feed. This was his regular Thursday run and he was thoroughly familiar with the State highway in the vicinity of the accident, having worked and lived near by for several years.

Claimant Frank Sweet, son of the deceased, was sitting on the front porch of the Sweet residence with his father and mother, the latter holding her grandchild, at about the time Mr. Foley left the Ralston feed store. His father, Levi, had just stepped off the porch and was standing in the dooryard. Frank stood up to enter the house and his attention was drawn to a truck approaching on the adjacent highway at a high rate of speed. An instant later he heard a thud up the highway, saw a series of flashes, and observed the truck seemingly pulling pole No. 38 behind it up the highway. He saw or heard no other vehicle on the road. Mrs. Sweet was not observing the highway at the time.

Following the collision, Frank saw wires drop down over the porch and around his father, a flash, and his father being thrown onto the highway. Shortly after he reached the place

where his father lay, Levi Sweet lapsed into unconsciousness and died before he reached the hospital.

Claimants swore assistant superintendent Watkins, in charge of transmission and distribution of the Central New York Power Corporation, who arrived shortly after the accident. He found that power pole No. 38 was split, with its stub standing out of the ground and the major portion of the pole lying up the road, some 100 feet westerly of Benton's gas station. The pole had been broken into three pieces. The guy wire supporting poles No. 38 and No. 39 was all twisted up on the ground near the truck. It was apparently still attached to the poles and had looped over the right rear reflector of the truck. The truck was standing on the northerly side of the highway about 15 feet west of the broken pieces of the pole and its driver, Foley, was standing by the vehicle. Other than a slight dent on the extreme top right front corner of the wooden rack, and indication that the rack had been moved back on the chassis slightly, the truck was undamaged.

Foley testified on the trial that he was driving 25 miles an hour, with the truck in third speed as he approached the Sweet residence. At a point about opposite their garage, he said he saw a car coming toward him and pulled off on to the northerly shoulder of the road to avoid hitting this automobile. He then related that he passed the other car in front of the Sweet residence but that he could not pull back on to the concreted portion of the highway because of the difference in elevation of the shoulder and that he sideswiped pole No. 38 further down the highway. He also testified that as he passed the pole, he did not feel anything but when the guy wire and truck became entangled, he was thrown away from the steering wheel. When asked to explain whether it was necessary for him to pull off the road; why he did not slow down or stop over the 200 odd feet distance between the place where he professed to be forced off the road and the site of the pole; why he did not see the other car which he claimed forced him off until he was but a few feet away, although sight distance was unobstructed for a long distance ahead, the witness was evasive or refused to answer many of the questions posed. He did state that in some manner the guy wire hooked on to the reflector sign upon the rear of the truck and agreed that at no time prior thereto did he decrease his speed or apply his brakes. There is no probative corroborative evidence to support the allegations that he was forced to drive on the shoulder of the road; that this caused him to strike the pole, or that he did strike and thus fell the pole.

It conclusively appears that the shoulder on the northerly side of the highway was in good condition on the day of the accident and was practically level with the elevation of the paved portion of the road in the vicinity and westerly of the Sweet residence. It further appears that Foley held a chauffeur's license, valid only when wearing corrective lenses, but at the time he was not wearing glasses.

With the above in mind and in the absence of direct or positive proof as to the cause of the pole breaking, we have scrutinized and studied the manner and circumstances of the occurrence and the accompanying evidence in order to ascertain and determine whether or not an inference of negligent omission or commission by the State is reasonable and whether or not such inference is the only one which can fairly and reasonably be drawn from the evidence. (*Ingersoll* v. *Liberty Bank of Buffalo*, 278 N. Y. 1, 7.) Reasonable men might not unreasonably say, that there was warning of peril when high voltage wires were maintained in such proximity to the highway under the circumstances herein. Liability is not defeated by the fact that they would not have fallen without the co-operative negligence of others. (*Sweet* v. *Perkins*, 196 N. Y. 482.) Reasonable apprehension is at times a question of law and at times, if varying inferences are possible, a question of fact. (*O'Neill* v. *City of Port Jervis*, 253 N. Y. 423.) Lawful inception will not exonerate the State from consequences of conditions which changing circumstances render hazardous and, but for the State's negligent omission, could be avoided. (*Stern* v. *International Ry. Co.*, 220 N. Y. 284; *Clawson* v. *Central Hudson Gas & Elec. Corp.*, 298 N. Y. 291.)

The State is under the absolute duty of keeping its highways in a reasonably safe condition for travel and is bound to exercise reasonable care to accomplish that end. (*Thompson* v. *State of New York*, 154 Misc. 707; *Doulin* v. *State of New York*, 251 App. Div. 767, affd. 277 N. Y. 558.) The State is not, however, an insurer of the safety of its highways, nor of the lives of persons passing over and along the same, nor is it required in the improvement and care of its roads, to do everything that human ingenuity and knowledge can devise to prevent the happenings of accidents, or injuries. It is ordinarily bound only to exercise ordinary care to see that its highways are reasonably safe for use and travel in the usual mode and the law does not exact that which is unreasonable or impracticable.

The poles, if placed and maintained with due regard for the public safety, are not necessarily public nuisances. They are

obstructions incidental to the exercise of a statutory right. (Transportation Corporations Law, § 11, subd. 3-b.) They are in some respects incidental to its proper use as a public highway. (*Robert* v. *Powell,* 168 N. Y. 411.) The statute has not said, however, where the poles shall be located. The implied condition is therefore attached that they must be so located as to avoid unreasonable and unnecessary danger to travelers upon the highway. (*Stern* v. *International Ry. Co.,* 220 N. Y. 284, *supra*; *Dougherty* v. *Trustees of Vil. of Horseheads,* 159 N. Y. 154; *Bailey* v. *Bell Tel. Co.,* 147 App. Div. 224.) Claimants contend the State's conduct herein amounts to the countenancing of, or the actual creation of an actionable nuisance.

The original concept of justice as established in the early English law, required anyone who caused harm to another to make good the loss regardless of any fault or intent to injure on the part of the actor. (Holdsworth's History of English Law, p. 51; 3 Holdsworth's History of English Law, p. 375. *et seq.*; 8 Holdsworth's History of English Law, p. 476 *et seq.*; Wigmore "Responsibility for Tortious Acts: Its History", 7 Harv. L. Rev. 315, 383, 441.)

But, as civilization advanced, the law advanced with it by adopting the modern view that it is unjust to require a person to pay losses resulting from harm caused innocently or accidentally without fault. Fault therefore becomes the basis of liability except in a limited class of cases.

Nuisance is a form of tort, but it is not restricted to a single type of tortious conduct. It denotes the wrongful invasion of a legal right or interest. It comprehends not only such invasion of property but of personal legal rights and privileges generally. It includes intentional harms and harms caused by negligence, reckless or ultrahazardous conduct.

To properly consider and determine tortious liability in accordance with legal principles, it is necessary to differentiate and classify the several types of tortious conduct. In general, they may be designated as follows: (1) culpable and intentional acts resulting in harm; (2) acts involving culpable and unlawful conduct causing unintentional harm; (3) nonculpable acts or conduct resulting in accidental harm for which, because of the hazards involved, the law imposes strict or absolute liability notwithstanding the absence of fault; and (4) culpable acts of inadvertence involving unreasonable risks of harm.

Where the harm and resulting damage are the necessary consequences of what the defendant is doing, or is incident to

the activity itself or the manner in which it is conducted, the law of negligence has no application and the rule of absolute liability applies. (*Bohan* v. *Port Jervis Gas Light Co.*, 122 N. Y. 18.)

There are also certain general types of conduct which, considered from a moral and social standpoint, involve culpable and unlawful acts and impose upon the actor strict or absolute liability for resulting harm without regard to the care exercised to prevent them. The violation of a safety statute, enjoining a specific legal requirement for the protection of others, is one example, as is interference with a street or highway without proper permission or authority.

The third type of conduct deals with certain harm for the creation or commission of which, even without fault, the law imposes liability. These acts furnish exceptions to the general rule that liability is based up fault. It is said that the doctrine, that in certain exceptional cases a man acts at his peril, is a survival of the time when all man's acts were done at his peril. Justice HOLMES says " The possibility of a great danger has the same effect as the probability of a less one, and the law throws the risk of the venture on the person who introduces the peril into the community." (Holmes on The Common Law, pp. 154, 155.) The fourth type of conduct comprehending culpable acts of inadvertence involving unreasonable risks of harm generally covers the field of negligence in which liability is based on the failure to exercise due care.

It thus appears that " nuisance " as a concept of the law has many meanings and that its primary meaning does not involve the element of negligence as one of its essential factors. And nuisance does not rest on the degree of care used, for that presents a question of negligence, but on the degree of danger existing even with the best of care. (*Melker* v. *City of New York*, 190 N. Y. 481.)

The Court of Appeals has denominated this latter classification and concept of nuisance as a " nuisance growing out of negligence." (*McFarlane* v. *City of Niagara Falls*, 247 N. Y. 340, 343; *Khoury* v. *County of Saratoga*, 267 N. Y. 384.) Thus the term " nuisance " has come to be applied to situations where liability is dependent upon the failure to exercise due care. (*Hayes* v. *Brooklyn Heights R. R. Co.*, 200 N. Y. 183.) If the existence of the pole and wire at that time was unreasonably dangerous " ' it makes little difference whether the danger be said to flow from maintenance of a nuisance or from a negligent

omission to guard the wayfarer.' '' (*Wenzel* v. *State of New York*, 178 Misc. 932, 934; *Koehler* v. *City of New York*, 262 N. Y. 74, 78.)

The rule of reasonable care must be considered, not in the light of the accident which happened, but with reference to what ordinary prudence should have anticipated as likely to happen. Many things are in the street which may be dangerous, yet there is no liability unless the person who put them there had reason to know and anticipate danger arising therefrom. (*Earley* v. *New York Tel. Co.*, 263 N. Y. 424.) The State did not place nor maintain these poles and was not necessarily liable for permitting them to be erected in the shoulder within 30 inches of the paved portion of the highway. (*Bailey* v. *Bell Tel. Co.*, 147 App. Div. 224, *supra; Rafferty* v. *State of New York*, 261 App. Div. 80; *Scofield* v. *Town of Poughkeepsie*, 122 App. Div. 868.) On the contrary, public use of the shoulder has been subject to substantial qualifications despite the fact that each obstruction may in some degree impede its use or create a danger. This is true of electric light and telephone poles and it would be difficult to find a hamlet or a village where such practices are not followed. If, however, these obstructions become sufficiently dangerous under the above principles, it becomes the State's duty to abate such situation after notice. (*Hayes* v. *Brooklyn Heights R. R. Co.*, 200 N. Y. 183, *supra; American Rapid Tel. Co.* v. *Hess*, 125 N. Y. 641.) '' It is one of the fundamental principles of the common law that no private interference with or purpresture in or upon the public highway will be tolerated.'' (*Clawson* v. *Central Hudson Gas & Elec. Corp.*, 298 N. Y. 291, 295, *supra.*) As pointed out in the above cases, there are certain situations in which what was lawful may be turned into a nuisance by negligence in maintenance, in which a continuing danger resulting in harm is often characterized as a nuisance although dependent upon negligence, as in the case of a highway out of repair. (*Klepper* v. *Seymour House Corp.*, 246 N. Y. 85.)

The claimants contend that such a situation existed and that the accident was caused by the negligence of the State in permitting a nuisance in the middle of the 5 foot northerly shoulder of this highway. The argument that such a pole carrying high voltage wires, located just outside a guardrail 30 inches from the edge of an unmarked 16-foot concrete road, creates an unreasonably dangerous obstruction, is impressive. The shoulder is a part of the highway. (*La Rue* v. *Tiernan*, 260 App. Div. 337,

affd. 285 N. Y. 550.) Maintenance of such a highway in such relative position to the pole and guy wire might well have been a direct cause of the collision. (*Russell* v. *State of New York,* 268 App. Div. 585.) Assuming such a situation existing to its knowledge as sufficient to predicate negligence upon the State, claimants may not prevail unless they have established a causal chain connecting such negligence or nuisance with the unfortunate demise of claimant's intestate.

It is urged that it was the '' impact of the heavily loaded moving truck against the pole which broke the same off and as it broke, doubtless the guy wire whipped or lashed out in such a way that it caught on to the reflector sign.'' The undisputed testimony of the size, condition and sturdiness of the pole and the negligible damage to the truck, together with the physical situation, negatives the acceptance of such a probability and the consideration of any other cause, upon the record herein, leads simply to endless speculation. The accident was exceptional and unusual. The credible evidence does not tend to show that such consequences would ordinarily ensue from such slight contact or were more likely to follow than not to follow therefrom. No expert testimony was presented to substantiate the reasonableness of claimants' theory or any other theory consistent or explanatory of the event. The accident itself is, of course, not such evidence and carries with it no presumption of negligence. (*Pyne* v. *Cazenovia Canning Co.,* 220 N. Y. 126.) '' There must be something definite and tangible that takes the question out of the realm of surmise and speculation ''. (*Scott* v. *Delaware, Lackawanna & Western R. R. Co.,* 222 App. Div. 409, 412.) '' Proof of negligence in the air, so to speak, will not do ''. (Pollock on Torts, p. 455.) Upon all the evidence in the case, we are convinced (1) there was no other vehicle upon the road which caused Foley to sideswipe pole No. 38; (2) that the truck did not sideswipe pole No. 38; (3) in some manner the right top corner of the truck rack struck the guy wire between pole No. 38 and pole No. 39, westerly of the guardrail extension, thus precipitating the primary accident.

That Foley saw no other car and that he was traveling fast, with a heavy load, appears conclusive from his demeanor upon the trial and from a careful analysis of the statements and testimony of claimant Frank Sweet, son of the deceased. Sweet was an honest and careful witness and repeated upon the stand substantially the same story he told the authorities shortly after the accident. That the truck first sideswiped the pole as

related, is in our opinion inconsistent with the physical circumstances. Even if these things happened, as told to us by Foley, the accident could not have happened without negligence on his part. The limits of the highway and shoulder were indicated by visible objects well known to him. There was nothing in the physical condition of the shoulder preventing him from safely negotiating the highway at that location, or to prevent him from stopping his truck at the speed related or turning back on to the pavement some distance before he reached the location of pole No. 38. There was no claim by him that he could not see or did not see where the pole and guardrail were, or that he was confused or misled.

Ordinarily common experience suggests that a large pole outside a modern guardrail in broad daylight is of itself sufficient notice of its presence. Under the facts in this case, we do not believe the maintenance of warning signs would have prevented the accident. We find no satisfactory proof that the inadequacy of the guardrail contributed thereto; that the shoulder of the highway was not properly maintained; that warning signs and traffic markings were necessary because of the slight curve and imperceptible narrowing of the roadway, nor that any or all of the foregoing were responsible for the accident herein. An entirely different question would be presented as to the adequacy of the highway and the position of these lawful obstructions, had the overhang of the truck actually demolished the pole.

We cannot draw inferences sufficient to establish liability from facts or conditions which are not shown affirmatively to have been the cause of the alleged accident. While a material fact may be established by circumstantial evidence, still to do so the circumstances must be such as to fairly and reasonably lead to the conclusion sought to be established, and to fairly and reasonably exclude any other hypothesis. " ' Insufficient evidence is, in the eye of the law, no evidence.' " (*Lopez* v. *Campbell*, 163 N. Y. 340, 348; *Ruppert* v. *Brooklyn Heights R. R. Co.*, 154 N. Y. 90.) Negligence in the existence and maintenance of the guy wire at the time, there may have been, but no such happening has been proved. As the origin cannot be identified, neither can the agency. There being no proof as to any dangerous condition of the wire or notice of any such condition to the State, such notice may not be imputed or presumed. (*Hoffart* v. *Town of West Turin*, 90 App. Div. 348, affd. 180 N. Y. 516.)

The guardrail designed to protect the pole and the embankment ended about 30 feet west of Benton's filling station. The broken pole lay in the road some 15 feet in the rear of the truck,

a good 100 feet west of the same station. The exact location of pole No. 39 does not appear but the photograph in evidence indicates its position as near the place where the truck stopped. The guy wire was attached to the top of pole No. 38 and to pole No. 39 about 10 or 15 feet above the ground. The height of the truck rack does not appear, nor are we informed as to the condition of the wire or whether it was taut and in place or whether the rack could strike it in normal position at such speed as to snap pole No. 38 and cause the slackened wire to entangle the right rear reflector in the absence of a protecting guardrail.

We may suspect that this happened and that the breaking of the electric wires which caused the death of Levi Sweet are thus more likely to have occurred from contact between the truck and the guy wire rather than with the pole. From the credible evidence, the theory that the contact between the truck and guy wire snapped the pole is stronger than the evidence that direct contact with the truck caused its destruction. (*Scharff v. Jackson,* 216 N. Y. 598; *White v. Lehigh Valley R. R. Co.,* 220 N. Y. 131.) " It has been said that circumstantial evidence consists in reasoning from facts which are known or proved, in order to establish such as are conjectured to exist, but the process is fatally vicious if the circumstance from which we seek to deduce the conclusion depends itself upon conjecture. \* \* \* In order to prove a fact by circumstances there should be positive proof of the facts from which the inference or conclusion is to be drawn. The circumstances themselves must be shown and not left to rest in conjecture, and when shown it must appear that the inference sought is the only one which can fairly and reasonably be drawn from these facts.'' (*Ruppert v. Brooklyn Heights R. R. Co.,* 154 N. Y. 90, 93–94, *supra*; *Srogi v. New York Central R. R. Co.,* 247 App. Div. 95.)

In the absence of sufficient evidence as to how or where the truck and guy wire came into contact or its effective contribution to the primary accident, and in the absence of knowledge of any negligent condition or change in the wire or of the reasonable likelihood of such a development, we may not adopt such inferences as sufficient to predicate liability under the circumstances herein. We may not base an inference on an inference. (*Lamb v. Union Ry. Co.,* 195 N. Y. 260, 266; *People v. Weiss,* 290 N. Y. 160, 163.) The evidence easily afforded an inference of the guy wire collaborating in the accidental means but any inference as to what put the means in motion other than the negligence of Foley must necessarily be drawn from other

inferences and assumptions equally capable of deductions not incompatible with the absence of causal negligence of the State.

The case is one which must arouse sympathy even if it cannot bear the test of rigorous legal rules. Third-party actions have been successively concluded. Although claimants place principal reliance upon the position of pole No. 38 as the proximate cause of the accident herein, a finding of fact supporting this contention would be against the weight of evidence. Claimants' difficulty is with the facts rather than with the law. Under all the circumstances, it cannot be said that the claimants have established by a fair preponderance of proof that the act of the State and its employees caused the accident. The motion by the State at the close of the trial is, therefore, granted and the claim dismissed.

Let judgment be entered accordingly.