**CITY OF NEW YORK, Plaintiff,**

v.

**BERETTA U.S.A. CORP.; Browning Arms Co.; Charco 2000, Inc.; Colt's Manufacturing Co., Inc.; Forjas Taurus, S.A.; Glock Inc.; Glock GmbH; Phoenix Arms; Sigarms, Inc.; Sig Arms Sauer GmbH f/k/a J.P. Sauer & Sohn Inc.; Smith & Wesson Corp.; Sturm, Ruger and Co., Inc.; Tanfoglio Fratelli S.R.L.; Taurus International Mfg, Inc.; Acusport Corp; Alamo Leather Goods, Inc.; Bangers, L.P.; Bill Hick's and Co., Ltd.; Brazas Sporting Arms, Inc.; Camfour, Inc.; Chattanooga Shooting Supplies, Inc.; Davidson's Supply Co., Inc.; Dixie Shooters Supply Inc.; Ellet Brothers, Inc.; Euclid Avenue Sales Co.; Faber Brothers, Inc.; Glen Zanders Fur and Sporting Goods, Co.; Hicks, Inc.; Kiesler Police Supply, Inc.; Lew Horton Distributing Co., Inc.; Lipsey's, Inc.; MKS Supply, Inc.; Riley's, Inc.; Ron Shirk's Shooters Supply, Inc.; RSR Group, Inc.; Scott Wholesale Co., Inc.; Southern Ohio Gun, Inc.; Sports South, Inc.; Valor Corp.; Walter Craig, Inc.; and Williams Shooters Supply, Defendants.**

No. 00 CV 3641(JBW).

United States District Court,
E.D. New York.

April 12, 2004.

Michael A. Cardozo, Corporation Counsel of the City of New York by: Eric Proshansky, Richard J. Costa, New York, NY, Violence Policy Center by: Mathew Nosanchuk, Washington, DC, Weil, Gotshal & Manges, LLP by: Steven A. Reiss, New York, NY, for Plaintiff City of New York.

Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC by: Lawrence S. Greenwald, Baltimore, MD, for Defendant Beretta U.S.A. Corp.

Friday, Eldredge & Clark, LLP by: Jonann E. Coniglio, Little Rock, AK, Jamie Huffman Jones, Renzulli, Pisciotti & Renzulli, LLP by: John F. Renzulli, Leonard S. Rosenbaum, New York, NY, for Defendant Browning Arms Co.

Jones Day by: Thomas E. Fennell, Michael L. Rice, Dallas, TX, for Defendant Colt's Manufacturing Co., Inc.

Budd Larner, P.C. by: Timothy A. Bumann, Atlanta, GA, Budd Larner, P.C. by: Kathleen Marchetti, Short Hills, NJ, for Defendants Forjas Taurus, S.A. and Taurus International Manufacturing, Inc.

Renzulli, Pisciotti & Renzulli, LLP by: John F. Renzulli, Leonard S. Rosenbaum, New York, NY, for Defendant Glock, Inc.

Tarics & Branisa, P.C. by: Michael J. Zomcik, Houston, TX, for Defendant Phoenix Arms.

Wilson, Elser, Moskowitz, Edelman & Dicker, LLP by: Jan Michael Skidds, New York, NY, for Defendants Sigarms, Inc. and Sig Arms Sauer GMBH f/k/a J.P. Sauer & Sohn, Inc.

Shook Hardy & Bacon, LLP by: Jeffrey S. Nelson, Kansas City, MO, Greenberg Traurig, LLP by: Alan Mansfield, New York, NY, for Defendant Smith & Wesson Corp.

Wildman, Harrold, Allen & Dixon by: James P. Dorr, Chicago, IL, for Defendant Sturm, Ruger & Co., Inc.

Saiber Schlesinger Satz & Goldstein, LLC by: David R. Gross, Christopher M. Chiafullo, Newark, NJ, for Defendants AcuSport Corp., Alamo Leather Goods, Inc.; Bangers, L.P., Bill Hicks & Co., Brazas Sporting Arms, Inc., Camfour Inc., Chattanooga Shooting Supplies, Inc.,

Davidson's Supply Co., Inc., Dixie Shooters Supply, Inc., Ellet Brothers, Inc., Faber Brothers, Inc., Glen Zanders Fur and Sporting Goods Co., Hicks, Inc., Kiesler Police Supply, Inc., Lew Horton Distributing Co., Lipsey's Inc., Riley's, Inc., RSR Group, Inc., Scott Wholesale Co., Inc., Ron Shirk's Shooter's Supplies, Inc., Southern Ohio Gun, Inc., and Sports South, Inc.

Scott L. Braum, Esq. by: Scott L. Braum, Dayton, OH, Saiber Schlesinger Satz & Goldstein, LLC by: David R.

Gross, Christopher M. Chiafullo, Newark, NJ, for Defendant MKS Supply, Inc.

United States Attorney's Office by: Elliot M. Schachner, Brooklyn, NY, United States Attorney's Office by: Vincent Lipari, Central Islip, NY, for Observer Attorney General of the United States.

## MEMORANDUM JUDGMENT & ORDER

WEINSTEIN, Senior District Judge.

Table of Contents

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

II. Factual and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

III. Preclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
 A. Effect of Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264
 B. Privity of a Non–Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 265
 1. Privity with State under Parens Patriae Doctrine . . . . . . . . . . . . . . . . . . 265
 2. Privity between Governmental Entities Generally . . . . . . . . . . . . . . . . . . 266
 3. Privity between New York State and New York City . . . . . . . . . . . . . . . . 268
 a. Development of the Legal Status of Cities . . . . . . . . . . . . . . . . . . . . . 268
 b. Modern Law of Municipal Corporations . . . . . . . . . . . . . . . . . . . . . . . 269
 c. Home Rule in New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271
 d. Relationship between New York State and New York City . . . . . . . . . . 273
 e. Governmental Entity Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273

IV. Statement of a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274
 A. Rule 12(b)(6) Standard and Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274
 B. Stare Decisis and the Rule of Erie . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275
 C. Stating a Public Nuisance Claim against the Firearms Industry . . . . . . . . . . . . 276
 1. Existence of a Public Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276
 2. Conduct of Defendants Creating, Contributing to, or Maintaining the
 Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277
 a. Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277
 i. Standard of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277
 ii. Intentional Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 278
 iii. Negligent Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279
 iv. Otherwise Lawful Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280
 b. Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
 i. Factual Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
 ii. Proximate Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282
 iii. Causation in Suits Against the Firearms Industry . . . . . . . . . . . . . 283
 3. Statutory Nuisance Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284

V. Commerce Clause and Due Process Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285
 A. Commerce Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285
 B. Due Process Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

VI. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

## I. *Introduction*

The City of New York sues manufacturers, importers and distributors of firearms for common law and statutory public nuisance. It asserts that the imprudent policies and practices of defendants in manufacturing, marketing, distributing, and selling guns substantially increase levels of gun use, crime, deaths, and injuries in New York City.

Defendants move to dismiss on the grounds that: (1) the City is precluded from bringing suit by the decision of the New York Supreme Court in *People v. Sturm, Ruger & Co., Inc.*, Index No. 402586/00 (Aug. 10, 2001), *aff'd*, 309 A.D.2d 91, 761 N.Y.S.2d 192 (N.Y.App.Div.2003), *leave to appeal denied*, 100 N.Y.2d 514, 769 N.Y.S.2d 200, 801 N.E.2d 421 (N.Y.2003) ("*Sturm, Ruger*"), a public nuisance suit brought by the State of New York in its *parens patriae* capacity; (2) the complaint fails to state a claim for public nuisance; and (3) the injunctive relief demanded by the City places an impermissible burden on interstate commerce in violation of the Commerce Clause and Due Process Clause. For the reasons stated below, the motion to dismiss is denied.

## II. *Factual and Procedural History*

The City of New York brought this action against manufacturers and importers of handguns and other firearms in June 2000 seeking monetary and injunctive relief. An amended complaint was filed in September 2000. Because the terrorist attacks of September 11, 2001 prevented the City from accessing its files, the case was stayed. In January 2004, the stay was lifted and the City was granted leave to amend its complaint a second time. *City of New York v. B.L. Jennings, Inc.*, 219 F.R.D. 255, 256 (E.D.N.Y.2004). In its second amended complaint, the City dropped causes of action based on negligence and a demand for monetary damages. The suit is now solely an equitable claim seeking an injunction to abate a public nuisance.

Defendants are manufacturers, importers and distributors of firearms that have allegedly been possessed or used illegally in New York City. The City asserts that, as a result of defendants' failure to institute appropriate marketing and distribution practices, defendants' guns are diverted into an illegal market catering to juveniles, criminals and other persons prohibited from owning guns. It alleges that defendants know or should know that a substantial number of their guns are diverted into the hands of criminals and that defendants could, but do not, take steps to reduce the harm occasioned by the use of these guns in New York to kill, maim, rob, and conduct other illegal activity, all to the great harm of the City.

The firearms market consists of primary and secondary tiers. The primary market is composed of transactions through which new firearms move from manufacturers and importers through wholesale distributors and retail dealers to a first retail purchaser. The secondary segment is characterized by the illegal sale and purchase of guns by non-federally licensed individuals. The City asserts that firearms move quickly from the legal primary market to the illegal secondary market, which is a significant source of firearms for criminals. It alleges that diversion from the primary, legal market to the secondary, illegal market is caused in large part by defendants' marketing and distribution practices. Defendants have allegedly failed to prevent diversion to the illegal market by, *inter alia*, failing to (1) monitor corrupt retailers; (2) require retail sales only through storefront establishments; (3) limit sales made at gun shows; (4)

prohibit straw sales by retailers; (5) limit sales of multiple guns to the same person; and (6) limit sales to dealers in states with lax gun laws. Defendants' inadequate oversight and supervision of the sale of their guns, it is claimed, results in many guns being transported into New York City where they are used criminally.

A unique serial number is stamped into every gun sold by a licensed manufacturer, which may not be obliterated. Each manufacturer, wholesaler and retailer keeps a record by serial number of every gun it sells and to whom it is sold. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has the ability to trace a gun's chain of sale using its serial number. Traces are initiated by requests from law enforcement agencies to ATF to determine the chain of sale of a firearm, usually one recovered in connection with a criminal investigation. Upon receipt of a trace request, ATF contacts the manufacturer identified by the gun's serial number. Firearms distributors and retailers down the line in the primary market in turn receive requests for gun traces from ATF until the consumer to whom the gun was sold by the retailer is identified. The enquiring law enforcement agency is informed of the results of the trace. Trace results are also recorded and retained by ATF in databases in the Federal Firearms Tracing System. *See generally Report of the Special Master Regarding Certain Data Maintained by the Bureau of Alcohol, Tobacco and Firearms, NAACP v. Acusport Corp.*, 210 F.R.D. 268 app. A (E.D.N.Y.2002).

The City cites data indicating that, in the period from August 1, 1997 to July 31, 1998, ATF traced 8,437 guns used in crimes in New York City. These guns were used in the commission of 433 robberies, 309 assaults, 278 homicides, 143 narcotics crimes, 101 burglaries, thefts or frauds, and 7,123 other firearms-related offenses. The complaint asserts that, when receiving ATF trace requests, defendants learn that guns sold by them have probably been involved in criminal activity, information they could use to support more prudent marketing practices, such as closing off the flow of guns to specific retailers or first purchasers connected to a disproportionate number of traces. ATF trace data, the City contends, can be used by defendants to reduce the illegal flow of weapons into New York City without interfering with ongoing criminal investigations.

The City alleges that, by acting to create, supply and maintain the illegal market for guns, defendants have created a public nuisance in New York City. Defendants' conduct, it is claimed, has caused loss to the City itself as a municipal entity; deprived its residents of the peaceful use of public streets, sidewalks and parks; interfered with commerce and travel in New York City; and endangered the property, health and safety of New Yorkers.

The City requests an injunction enjoining the public nuisance by requiring defendants to adopt a variety of prudent marketing practices including the monitoring and supervision of distributors and retailers with whom defendants do business.

### III. *Preclusion*

Contrary to defendants' contention, the City's claim is not barred as a matter of *res judicata* by the decision of the New York Supreme Court in *Sturm, Ruger*, Index No. 402586/00, or by the affirmation of that decision by the Appellate Division, 309 A.D.2d 91, 761 N.Y.S.2d 192. Brought by the Attorney General of the State of New York on behalf of the people of New York in his *parens patriae* capacity, *Sturm, Ruger* was dismissed for failure to state a cause of action for public nuisance. Index No. 402586/00 at 1–2. Because it was dismissed before answers were filed

or discovery was taken, and the trial court specifically noted facts, which, if alleged, might be sufficient to state a cause of action, *see id.* at 26–27, the decision does not constitute a final judgment on the merits of a similar claim.

There is an additional independent reason for denying preclusion in the instant case. The substantial degree of autonomy historically enjoyed by New York City to act on matters of local concern, as well as the proper delineation of authority between the Corporation Counsel of the City of New York and the Attorney General of the State of New York, require that the City not be characterized as a privy of the State for *res judicata* purposes.

Federal courts are mandated to give preclusive effect to a state court decision where such an effect would be given by the courts of that state. *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). (citing 28 U.S.C. § 1738). New York law determines the effect of the state court's decision in *Sturm, Ruger.* In New York the doctrine of *res judicata* requires that once a final decision on the merits is issued on a claim, all other claims among the parties or their privies arising out of the same transaction or series of transactions are barred. *Green v. Santa Fe Indus., Inc.,* 70 N.Y.2d 244, 519 N.Y.S.2d 793, 514 N.E.2d 105, 108 (1987); *In re Shea's Will,* 309 N.Y. 605, 132 N.E.2d 864, 868 (1956).

A. *Effect of Motion to Dismiss*

"A judgment dismissing a cause of action before the close of the proponent's evidence is not a dismissal on the merits unless it specifies otherwise, but a judgment dismissing a cause of action after the close of the proponent's evidence is a dismissal on the merits unless it specifies otherwise." N.Y. CPLR 5013. The disposition need not contain the words "on the merits" if it appears from the judgment that the dismissal was on the merits. *Strange v. Montefiore Hospital and Medical Ctr.,* 59 N.Y.2d 737, 463 N.Y.S.2d 429, 450 N.E.2d 235, 236 (1983).

A granted motion to dismiss is generally not *res judicata* of the entire merits of a case, but only of the point actually decided. *Plattsburgh Quarries, Inc. v. Palcon Indus., Inc.,* 129 A.D.2d 844, 513 N.Y.S.2d 861 (N.Y.App.Div.1987); *De-Ronda v. Greater Amsterdam School District,* 91 A.D.2d 1088, 458 N.Y.S.2d 310, 312 (N.Y.App.Div.1983). If the dismissal was based on insufficiency of the pleadings pursuant to New York CPLR 3211(a)(7), a new action that remedies the deficiency will not be precluded. *See 175 East 74th Corp. v. Hartford Acc. & Ind. Co.,* 51 N.Y.2d 585, 435 N.Y.S.2d 584, 416 N.E.2d 584, 586 n. 1 (1980); *cf. Lampert v. Ambassador Factors Corp.,* 266 A.D.2d 124, 698 N.Y.S.2d 234, 235 (N.Y.App.Div.1999) (dismissing second suit on *res judicata* grounds but noting that result might have been different if plaintiff had supplied the omission determined to have existed in the prior complaint). Given the limited scope of a Rule 3211(a)(7) determination, courts are reluctant to find the dismissal of a prior complaint on the pleadings sufficient to preclude a second action. *See, e.g., Hodge v. Hotel Employees and Rest. Employees Union Local 100 of AFL–CIO,* 269 A.D.2d 330, 703 N.Y.S.2d 184, 185 (2000); *Amsterdam Savings Bank v. Marine Midland Bank,* 140 A.D.2d 781, 528 N.Y.S.2d 184, 185 (N.Y.App.Div.1988); *Plattsburgh Quarries, Inc. v. Palcon Indus., Inc.,* 129 A.D.2d 844, 513 N.Y.S.2d 861 (N.Y.App. Div.1987).

The New York Supreme Court's dismissal of the complaint in *Sturm, Ruger* does not constitute a judgment on the merits which would bar the City's public

nuisance claim. The allegations in the instant suit are not identical to those in the state case. Rather, the City's complaint corrects the defects and omissions in pleading identified by the court in *Sturm, Ruger. See* Part IV.C, *infra.*

### B. *Privity of a Non–Party*

■ A judgment on the merits in a prior action is binding not only on the parties to that action, but on those in privity with them. *Green v. Santa Fe Indus., Inc.,* 70 N.Y.2d 244, 519 N.Y.S.2d 793, 514 N.E.2d 105, 108 (1987). "The term privity does not have a technical and well-defined meaning. Rather it is an amorphous concept not easy of application." *Juan C. v. Cortines,* 89 N.Y.2d 659, 657 N.Y.S.2d 581, 679 N.E.2d 1061, 1065 (1997) (internal quotations and citations omitted). It must be determined on a case-by-case basis. *See Watts v. Swiss Bank Corp.,* 27 N.Y.2d 270, 317 N.Y.S.2d 315, 265 N.E.2d 739, 743 (1970).

■ To establish privity of a nonparty with a party to an earlier litigation, "the connection between the parties must be such that the interests of the nonparty can be said to have been represented in the prior proceeding." *Green,* 519 N.Y.S.2d 793, 514 N.E.2d at 108. Privity is determined by considering whether the circumstances "of the actual relationship, their mutuality of interests and the manner in which the nonparty's interests were represented in the earlier litigation establishes a functional representation such that the nonparty may be thought to have had a vicarious day in court." *Slocum on Behalf of Nathan A. v. Joseph B.,* 183 A.D.2d 102, 588 N.Y.S.2d 930, 931 (N.Y.App.Div.1992) (internal quotation and citation omitted). Privity may also be found where the party to be barred controlled the conduct of the prior litigation to further its own interests.

*Green,* 519 N.Y.S.2d 793, 514 N.E.2d at 108.

### 1. *Privity with State under Parens Patriae Doctrine*

■ The doctrine of *parens patriae* grants standing to a state to sue on behalf of its citizens. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). "The doctrine is not limited to suits between [s]tates, but also applies to suits in which the defendant is not a[s]tate." *Connecticut v. Cahill,* 217 F.3d 93, 97 (2d Cir.2000). To maintain such an action, the state must assert a sovereign interest apart from the interests of particular private parties, such as a general interest in the health and well-being of its residents. *Alfred L. Snapp & Son,* 458 U.S. at 607, 102 S.Ct. 3260.

■ It is presumed that a state suing in its *parens patriae* capacity will adequately represent the position of its citizens. *Alaska Sport Fishing Ass'n v. Exxon Corp.,* 34 F.3d 769, 773 (9th Cir.1994). Thus courts have held that when *parens patriae* authority is asserted, it can bind the citizens of a state as privies for *res judicata* purposes. *See, e.g., City of Tacoma v. Taxpayers of Tacoma,* 357 U.S. 320, 340–41, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958) (taxpayers of Tacoma, as citizens of State of Washington, were represented by State in prior proceedings and were thus bound by the judgment); *Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 692 n. 32, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (commercial fishing associations and their members, as citizens of State of Washington, were bound by injunction in prior case to which State was a party); *Alaska Sport Fishing Ass'n v. Exxon Corp.,* 34 F.3d 769, 774 (9th Cir.1994) (sports fishermen were privies of government under *parens patri-*

*ae* doctrine, subject to *res judicata* bar from asserting lost recreational use claims from Exxon Valdez oil spill); *Badgley v. City of New York*, 606 F.2d 358, 364 (2d Cir.1979) (terms of consent decree entered into in prior suit in which State of Pennsylvania acted as *parens patriae* were conclusive upon all Pennsylvania citizens and binding upon their rights); *United States v. Olin Corp.*, 606 F.Supp. 1301, 1308 (N.D.Ala.1985) (prior suit by State of Alabama, in its *parens patriae* capacity, to abate public nuisance created by presence of contaminants barred residents of that state from seeking injunctive relief to require corporations to remove same contaminants); *cf. Lucas v. Planning Bd. of the Town of LaGrange*, 7 F.Supp.2d 310, 328 (S.D.N.Y.1998) (town "adequately represented" its citizens so that they were bound by terms of consent decree in prior litigation). Such cases generally focus on the distinction between public and private rights, permitting citizens to bring suit, notwithstanding a prior action by the state, where they allege violations of purely private interests that have caused particular damage to the individual. *See Richards v. Jefferson County, Ala.*, 517 U.S. 793, 803–04, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996); *Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464, 1470 (10th Cir.1993); *Lucas*, 7 F.Supp.2d at 327–28.

Analysis of public versus private rights in the context of *parens patriae* litigation has largely been limited to the federal courts and confined to consideration of successive government and citizen actions. Courts have engaged in a different analysis when considering successive governmental litigation:

> [S]uccessive governmental litigation is most likely to require determination of the relative authority of different government agencies ... Successive government and citizen actions, on the other hand, ordinarily focus on distinctions between public and private rights and potential conflicts of interest; the relative authority of different government agencies is not often a problem.

18A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure: Jurisdiction § 4458 at 552 (2d ed.2002).

The issue of whether a prior case brought by New York State in its *parens patriae* capacity will bar the City of New York or other sub-state entities from subsequently bringing suit on the same cause of action has apparently never been decided by New York state courts. Defendants argue that the City of New York should be precluded from bringing this action because it seeks to vindicate the same interest on behalf of the same citizens bound by the decision of the New York Supreme Court in *Sturm, Ruger*.

The City is not precluded under the doctrine of *res judicata*, however, simply because its residents, if suing as private plaintiffs, might be barred from bringing suit. The City's interest cannot be characterized as coterminous with that of its inhabitants'; it has a municipal interest that is separate and distinct from, and not duplicative of, the interests of individual New Yorkers. Given that the instant case involves a subsequent suit by a sub-state governmental body, not a private citizen, it is appropriate to examine New York law governing the relative authority of governmental entities, particularly the relationship between the State and City of New York. *See* Parts III.B.2 & 3, *infra*.

### 2. *Privity between Governmental Entities Generally*

Under some circumstances, a final decision on the merits that is binding on one governmental agency or official may not be binding on another agency or official. *See*

*Juan C. v. Cortines*, 89 N.Y.2d 659, 657 N.Y.S.2d 581, 679 N.E.2d 1061, 1066 (1997).

> If the second action involves an agency or official whose functions and responsibilities are so distinct from those of the agency or official in the first action that applying preclusion would interfere with the proper allocation of authority between them, the earlier judgment should not be given preclusive effect in the second action.

*Id.* (quoting Restatement (Second) of Judgments, § 36, cmt. f). The source of authority of the governmental units is not dispositive of whether they are in privity for preclusion purposes. More compelling is their actual and statutory relationship and functions, which may be indicative of their relative independence. *See id.* (citations omitted).

In *Juan C. v. Cortines*, the New York Court of Appeals considered whether the doctrine of collateral estoppel applied to preclude education officials from separately determining the suspension and reassignment of a student found with a gun at school after the Family Court, in a juvenile delinquency proceeding, had suppressed the gun and dismissed the delinquency petition. In determining whether the education officials and the family court prosecutor could be considered in privity for purposes of preclusion, the court looked to the "nature, particular function, and purpose" of the two governmental entities. *Id.* at 1066, 657 N.Y.S.2d 581. Despite the fact that Corporation Counsel had acted as prosecutor in the family court proceeding and subsequently represented the education officials, the court found his roles in the two procedures to be "functionally discrete and traced to very different source lines of authority." *Id.* The court looked to the actual relationship between the two agencies and the statutory framework delineating the role and scope of authority of the Corporation Counsel in juvenile delinquency proceedings. *Id.* at 1066–68, 657 N.Y.S.2d 581. It concluded that:

> In law, purpose and actual practice, the [educational official's] procedures and wider educational community concerns are functionally and fundamentally discrete and independent from the [Corporation Counsel's] uniquely delegated and described responsibility in a juvenile delinquency proceeding in Family Court.

*Id.* at 1068, 657 N.Y.S.2d 581.

New York courts have largely refused to find two functionally independent governmental entities in privity with each other for purposes of preclusion. *See, e.g., Brown v. City of New York*, 60 N.Y.2d 897, 470 N.Y.S.2d 573, 458 N.E.2d 1250, 1251 (1983) (district attorney and City of New York not in privity); *Saccoccio v. Lange*, 194 A.D.2d 794, 599 N.Y.S.2d 306 (N.Y.App.Div.1993) (district attorney and county attorney not in privity); *Doe v. City of Mount Vernon*, 156 A.D.2d 329, 548 N.Y.S.2d 282 (N.Y.App.Div.1989) (district attorney and county not in privity); *People v. Morgan*, 111 A.D.2d 771, 490 N.Y.S.2d 30 (N.Y.App.Div.1985) (city housing authority and district attorney not in privity); *see also* 18A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure: Jurisdiction § 4458 at 558–59 (2d ed. 2002) ("[S]tate law may recognize substantial autonomy that frees a subdivision from the burdens—and even the benefits—of litigation by a state agency.") (citing *Harris County, Texas v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 318–19 (5th Cir. 1999) (county not in privity with or virtually represented by state attorney general)). *But see People ex rel. Dowdy v. Smith*, 48 N.Y.2d 477, 423 N.Y.S.2d 862, 399 N.E.2d 894, 896 (1979) (People *qua* prosecutor stood in "sufficient relationship" with Division of Parole to be considered in privity).

### 3. Privity between New York State and New York City

The law affords New York City a substantial degree of autonomy from the State. To understand why this is the case, it is helpful to examine the historical development of the law of municipal corporations and the struggle for the right to local self-government or "home rule." *See* Parts III.B.3.a & b, *infra.* As a result of the home rule movement in New York, the state constitution now contains a bill of rights for local government and grants municipalities a wide latitude to legislate on matters of local concern such as the safety, health and well-being of their residents. *See* N.Y. Const., art. IX, discussed in greater detail in Part III.B.3.c, *infra.* One issue of particular local concern to New York City is the problem of gun-related violence. Although deaths and injuries due to firearms occur throughout the State, the prevalence and severity of the problem in the City means that its priorities are functionally and fundamentally discrete from those of the State. *See* Part III.B.3.d, *infra.* In light of the respect for local autonomy embodied in New York law, precluding the City from bringing a suit aimed at redressing the problem of gun-related violence would interfere with its authority to promote the safety and well-being of its inhabitants. Barring the City from litigating its public nuisance claim would also interfere with the proper delineation of authority between the Corporation Counsel and the Attorney General. *See* Part III.B.3.e, *infra.*

### a. Development of the Legal Status of Cities

For most of recorded human history, cities have been a principal factor in the progress of civilization. 1 Eugene McQuillin, *The Law of Municipal Corporations* § 1.01 at 3 (3d ed.1999) (hereinafter *Mun.* *Corp.*); *see also People v. Morris,* 13 Wend. 325 (N.Y.Sup.Ct.1835) ("The forming of cities into communities, corporations, or bodies politic, and granting them the privileges of municipal jurisdiction, contributed more than any other cause to introduce regular government, police and arts, and to diffuse them over Europe."). Because the city is an entity intermediate between the state and the individual, legal theorists have struggled over how to characterize its legal status. Over time, the law governing cities has evolved into a delicate balance between the reality that cities are creations of the state, subject to its power and authority, and the need for substantial local autonomy.

Originally formed as an economic association of merchants seeking protection from outside control, the medieval town is considered "the ancestor of the modern city." *See* Gerald E. Frug, *The City as a Legal Concept,* 93 Harv. L.Rev. 1059, 1081, 1083 (1980). English merchants were able to establish a degree of autonomy from the King and the nobility which, in turn, fostered a strong sense of community within the town. *Id.* at 1083. Over time, the town began to emerge as a separate entity with rights and duties independent of, and often contrary to, those of its inhabitants. The first city charter was granted by King Henry VI in 1439. *Id.* at 1087.

The early English town was characterized by its relationship to the King. The liberty of towns and the protection of freehold interests had been established by the Magna Carta; even so, the King persistently sought control over the merchant class. *Id.* at 1091. In 1682, Charles II asserted the right to revoke the corporate status of the City of London. In his view, abrogation of a London's charter for wrongdoing was integral to royal power. *Id.* at 1092–93. City officials, however, contended that its corporate charter was a

vested property right which could not be taken away. *Id.* at 1093. "The King's victory in the London case ... established the legal tradition of royal control of the cities for a time." *Id.* at 1094. With the demise of the Stuart reign in 1688, "the immunity of corporate charters from royal abrogation was reestablished." *Id.* at 1094.

Most early American cities did not possess the formal corporate structure of their English counterparts. Prior to the Revolution, there were only about twenty incorporated cities in the colonies. *Id.* at 1096–97; *cf. Mun. Corp.* § 1.09 at 10 ("During the colonial period some twenty-four municipal corporations received charters as cities...."). Nevertheless, most colonial cities had rights and exercised power as distinct entities and were treated by the courts as if they were corporations. Frug, *supra,* at 1097–98. Under English law, they had the capacity to take and grant property, to sue and be sued, and to have a common seal. *Mun. Corp.* § 1.16 at 17. They also possessed limited authority to pass ordinances relating to matters of local concern. *Id.* § 1.14 at 14. Members of the council, the chief authority of the municipal corporation, were chosen by popular vote, the right to vote generally being limited to white male freeholders or taxpayers. *Id.* §§ 1.16, 1.18 at 17–18. After the Revolution, most municipal charters were confirmed by the legislature of the state in which the city was located. *Id.* § 1.09 at 10.

By the early nineteenth century, a distinction between public and private corporations was emerging. *See* Frug, *supra,* at 1099–100 ("The corporation as an entity that was simultaneously a rightholder and power wielder thus disappeared. In its place emerged the private corporation, which was an individual right holder, and the public corporation, an entity that was identified with the state."). In 1819, the Supreme Court considered the status of cities under the rubric of the public-private distinction:

> Another division of corporations is into public and private. Public corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interests; but strictly speaking, public corporations are such only as are founded by the government for public purposes, where the whole interests belong also to the government.

*Trustees of Dartmouth College v. Woodward,* 17 U.S. (4 Wheat.) 518, 668–69, 4 L.Ed. 629 (1819) (Story, J. concurring). New York's Chancellor Kent further refined this view, dividing a city's authority into two parts—the power to legislate for the public good and the power to hold private property for municipal uses:

> [Public corporations] are invested with subordinate legislative powers, to be exercised for local purposes connected with the public good; and such powers are subject to the control of the legislature of the state. They may also be empowered to take or hold private property for municipal uses; and such property is invested with the security of other private rights.

2 J. Kent, Commentaries on American Law *275 (footnote omitted). The concept of cities as public corporations became, and remains, the dominant view regarding the legal status of cities in the United States.

### b. *Modern Law of Municipal Corporations*

By the close of the nineteenth century the assumption that cities were subject to state control, although within state consti-

tutional limits, was firmly entrenched. *See, e.g., Hunter v. City of Pittsburgh,* 207 U.S. 161, 178–79, 28 S.Ct. 40, 52 L.Ed. 151 (1907) ("The [s]tate ... at its pleasure may modify or withdraw all [city] powers, may take without compensation [city] property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation."); *City of Trenton v. New Jersey,* 262 U.S. 182, 187, 43 S.Ct. 534, 67 L.Ed. 937 (1923) ("However great or small [the city's] sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the sovereign will.") (citations omitted). This view is exemplified in the writings of John Dillon who, in 1872, wrote the first American treatise on municipal corporations. Dillon advocated expansive state control of cities and strict construction of a city's powers by the courts. *See* Frug, supra, at 1111–12 (construing J. Dillon, Treatise on the Law of Municipal Corporations (1st ed. 1872)). Dillon's Rule, as it has come to be known, provides that cities possess only those powers that can be traced to explicit delegations of authority from the state; in the absence of such delegations, cities are powerless to act. *See id* at 1112.

In the late 1800s a political challenge to state control of cities sprang up under the banner of "home rule." Home rule in its broadest sense increased the power and independence of local self-government. The home rule movement called for the amendment of state constitutions to give municipalities more extensive authority. *See id.* at 1115–16. State legislation at that time included restrictions on state powers to pass "special" or local legislation as opposed to "general" legislation, and the grant of authority to cities to enact local laws without state authorization. *Id.* at 1116–17. The home rule movement repre-

sented an important shift in the law of municipal corporations:

> Before home rule, it is often said, local governments generally lacked even the independent initiatory authority to perform the most mundane of functions—let alone immunity from state legislative attempts to dictate how those functions should be performed. After home rule, many local governments, particularly large ones, could adopt charters that set forth their own powers and enable them to appoint their own officers. They were no longer governed by the precise terms of express and specific state legislation. What once had been mere creatures of state legislatures were no longer so.

David J. Barron, *Reclaiming Home Rule,* 116 Harv. L.Rev. 2255, 2290 (2003).

As it has evolved over the years, home rule now embodies at least three ideas: "(1) the choice of the character of the municipal organization, that is, the selection of the charter; (2) the nature and scope of the municipal service; and (3) all local activity, whether in carrying out or enforcing state law or municipal regulations, in the hands of city or town officers, selected by the community." *Mun. Corp.* § 1.41 at 52. It is part of the law, in constitutional or statutory form, of all but two states. Barron, *supra,* at 2260. The Supreme Court has itself recognized the importance of local autonomy to the effectiveness of American government. *See, e.g., Avery v. Midland County,* 390 U.S. 474, 481, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968) ("In a word, institutions of local government have always been a major aspect of our system, and their responsible and responsive operation is today of increasing importance to the quality of life of more and more of our citizens.").

### c. Home Rule in New York

As indicated by the foremost authority on New York home rule, former New York City Corporation Counsel W. Bernard Richland, the home rule provisions in the New York state constitution were influenced by a long history of abuses by the state legislature. *See generally* W. Bernard Richland, *Constitutional City Home Rule in New York*, 54 Colum. L.Rev. 311 (1954) [hereinafter Richland, *Home Rule I*]. Beginning in the early nineteenth century, home rule sentiments were championed by public officials, judges and others in response to the disproportionately low representation of New York City in New York State government. *See id.* at 316–20. The notion of local self-government was vigorously opposed by those who felt it would foster the excesses and corruption of Tammany Hall, epitomized by Boss Tweed and his cohorts who presided over the City in the latter part of the 1800s by the use of threats, bribery and the plundering of public resources. *See id.* at 320–21; *see also* Edwin G. Burrows & Mike Wallace, *Gotham: A History of New York City to 1898*, at 837–41 (1999) (describing Republican reformers' efforts to keep the City in check by shifting control of the metropolitan police force to the State, a move which led to chaos and rioting).

Home rule provisions were added to the constitution in 1894 and 1907, but the first significant grant of municipal power was contained in the 1924 Home Rule Amendment. *See* Richland, *Home Rule I, supra*, at 321, 323, 327. "In its constitutional home rule provisions, New York has consistently adopted the *imperium in imperio* model; a limited sphere of power has been carved out in which local governments are to be autonomous, and, conversely, an attempt has been made to preclude legislative intrusion into purely local concerns." W. Bernard Richland, *Home Rule and the New York Constitution*, 66 Colum. L.Rev. 1145, 1147 (1966) [hereinafter Richland, *Home Rule II* ]. The 1924 Home Rule Amendment expressed this policy. It endowed cities with the power to adopt and amend local laws not inconsistent with the laws of the State, and conditioned the authority of the state legislature to pass laws "relating to the property, affairs or government of cities, which shall be special or local either in its terms or in its effect" upon an emergency message from the Governor and a two-thirds vote of each legislative house. N.Y. Const., art. XII, §§ 2, 3 (1924). The 1938 home rule amendments retained the basic structure and content of the 1924 provision and extended home rule to counties. *See* Richland, *Home Rule II, supra*, at 1148; Richard Briffault, *Local Government and the New York State Constitution*, 1 Hofstra L. & Pol'y Symp. 79, 86 (1996).

Early on, however, in the seminal case of *Adler v. Deegan*, 251 N.Y. 467, 167 N.E. 705 (1929), the New York Court of Appeals very nearly "shattered" the concept of home rule. *See* Richland, *Home Rule I, supra*, at 330. At issue in *Adler* was the validity of the Multiple Dwelling Law, which was attacked as violative of the 1924 Home Rule Amendment because it had been passed by the legislature without an emergency message from the Governor. 167 N.E. at 706. The Court upheld the law, finding that it concerned matters of state concern and therefore was properly passed without the home rule requirements of the state constitution. *Id.* at 708–09. The opinion is most remembered for the concurring opinion of Chief Justice Cardozo. Cardozo introduced the concept of "state concern" into home rule doctrine, concluding that "if the subject be in substantial degree a matter of state concern, the Legislature may act, though intermingled with it are concerns of the locality." *Id.* at 714. According to this reasoning,

"any actual element of state concern may, it seems, be sufficient to render inapplicable the home rule requirements." Richland, *Home Rule I, supra,* at 331. Subsequent court interpretations of *Adler* have routinely used it to reject home rule challenges to state legislation. *See* James D. Cole, *Constitutional Home Rule in New York: "The Ghost of Home Rule,"* 59 St. John's L.Rev. 713, 718 (1985). The case also stands for the proposition that "local regulations could be adopted to add additional protections, as long as the city's involvement is consistent with the powers of the State." *Id.* at 718–19.

In 1963, the current version of New York's home rule amendment was adopted. *See* N.Y. Const. art. IX. It retains the *imperium in imperio* model of the 1924 and 1938 amendments, but contains additional provisions intended to expand the scope of local self-government. *See* Richland, *Home Rule II, supra,* at 1148; Briffault, *supra,* at 90. Included in Article IX is an express declaration that "[e]ffective local self-government and intergovernmental cooperation are purposes of the people of this state" and a bill of rights for local government. N.Y. Const. art. IX, § 1; *see also* 25 N.Y.Jur.2d, Counties, Towns, and Municipal Corporations § 81 (by providing in the state constitution for a bill of rights for local governments, New York recognizes the inherent right of municipalities to self-government). The provision expands local lawmaking powers to encompass both local laws not inconsistent with any general law relating to property, affairs or government, and laws with respect to ten enumerated subjects, whether or not they relate to property, affairs or government, most notably those laws traditionally viewed as falling under the police power. N.Y. Const. art. IX, § 2(c); *cf.* Jack B. Weinstein, *A New York Constitution Meeting Today's Needs and Tomorrow's Challenges* 141 (National Mun.

League 1967) ("[I]t must be recognized that no formulation is likely to be successful in dividing matters which ought to be left entirely to local government and matters which should be left entirely to the state. It is difficult to conceive of any important subject of interest to local government which is not also properly of interest to the state as a whole."). Article IX directs the legislature to enact a statute "granting to local governments powers including but not limited to those of local legislation and administration." N.Y. Const. art IX, § 2(b)(1); *see also* N.Y. Mun. Home Rule Law (implementing art. IX, § 2(b)(1)). Section 3 repudiates Dillon's Rule of strict construction by providing for a liberal construction of the "rights, powers, privileges and immunities granted to local governments." *Id.* § 3(c).

"In short, Article IX provides local governments with a number of general and specific grants of power that together constitute a rather broad authorization to initiate local policy-making." Briffault, *supra,* at 89; *see also* Jack B. Weinstein, *Issues for the 1967 Constitutional Convention,* at 10–12, Barbara A. Shapiro, *Local Law Enforcement in New York State,* Steven H. Steinglass, *County Home Rule in New York State,* Frank J. Macchiarola, *Local Finances under the New York State Constitution,* Frederick H. Dulles, *Metropolitan Regional Problems, in Essays on the New York Constitution* (Jack B. Weinstein ed., Fred B. Rothman & Co.1966) (examining state-local relations in New York shortly after adoption of Article IX). Despite the apparent intent of Article IX to enlarge the scope of local self-government, however, home rule continued to be construed somewhat narrowly by New York courts. *See* Richland, *Home Rule II, supra,* at 1148–51; Cole, *supra,* at 715; Briffault, *supra,* at 89–90.

d. *Relationship between New York State and New York City*

"The struggle for home rule in New York [S]tate is an aspect of the contest for power which has been going on for more than a century between New York City, dominated by one political party, and the rural areas of the [S]tate, dominated by the other." Richland, *Home Rule I, supra*, at 316. In addition to disagreements about home rule, metropolis and countryside have clashed over issues such as agrarian and commercial interests, apportionment of the state legislature, regulation of the sale of alcohol, and allocation of state tax revenues, particularly to schools. *See* David Maldwyn Ellis, *New York: State and City* 180–99 (1979). So acrimonious has the relationship been at times between the mostly Republic Northerners and the mostly Democratic New York City dwellers, that it is said to have led writer Norman Mailer to run for Mayor of New York in 1969 on a platform that would establish the City as the fifty-first state. *Id.* at 180.

One issue which currently divides New York City from most of the rest of the State is the regulation of firearms. Perhaps because of the disproportionate impact of gun violence on New York City, its attitude towards firearms regulation differs from that of much of the rest of the State. *See, e.g.*, Shaila K. Dewan, *Man is Shot for Cellphone on Busy Day of Mayhem*, N.Y. Times, Apr. 12, 2004 (reporting that there were twelve shootings in New York City in 24–hour period and noting that there have been an average of 3.3. shooting victims a day this year). The voting records of the representatives of the State Assembly suggest this difference. In March of 2004, a bill intended to reduce illegal trafficking of guns was introduced in the New York State Assembly. Of the sixty-five assemblymembers from

New York City, only one voted against the enactment; in contrast, over seventy percent of assemblymembers from upstate districts voted against the bill. *See* New York State Assembly, *Bill Summary— A08456*, at http:// assembly.state.ny.us/leg/?bn=A08456 (summarizing Bill A.8456, a bill intended to "reduce gun trafficking by making it more difficult for criminals to obtain firearms" and listing votes of individual assemblymembers).

Stricter views on gun control have led New York City to promulgate a layer of firearms regulation on top of the framework established by the State. Licenses to keep a gun in one's home or place of business must be renewed in the City every three years; upstate, licenses are valid for life. The Association of the Bar of the City of New York, *Taking Aim: New York State's Regulation of Firearms and Proposals for Reform*, at 3–4, *available at* http:// www.abcny.org/reports/index.php. While New York State does not require a license for the possession of rifles or shotguns, New York City does. *Id.* at 6. In addition, although the State allows juveniles to own a rifle or shotgun if they are in possession of a valid hunting license, the City will not issue a license to possess a rifle or shotgun to anyone younger than eighteen. *Id.* at 7–8.

e. *Governmental Entity Analysis*

Precluding the City from bringing suit aimed at redressing the problem of gun-related violence would interfere with the authority accorded it under New York's home rule provisions. Consistent with Article IX of the state constitution, the City has the authority to take action on issues of local concern including those affecting the safety, health and well-being of its inhabitants. *See* N.Y. Const. art. IX, § 2(c). The New York Court of Appeals has recognized that, where the public

health is a factor, a municipality's right to bring "an action to restrain a public nuisance may be tantamount to its right of survival." *New York Trap Rock Corp. v. Town of Clarkstown,* 299 N.Y. 77, 85 N.E.2d 873, 877 (1949). To preclude the City of New York from doing so in the instant suit, especially when its experience with and attitude toward firearms is so distinct from that of the rest of the State, would be contrary to the current State–City legal relationship.

Barring the City from litigating its public nuisance claim would also interfere with the proper delineation of authority, in theory and in practice, between the City Corporation Counsel and the State Attorney General. The Charter of the City of New York provides that the Corporation Counsel's authority to conduct all the law business of the City of New York is "exclusive." *See, e.g., Caruso v. New York City Police Dep't Pension Funds,* 72 N.Y.2d 568, 535 N.Y.S.2d 349, 531 N.E.2d 1281, 1283 (1988) (citing N.Y.C. Charter §§ 394(a), 395). Similarly, the Attorney General is granted "charge and control of all the legal business of the departments and bureaus of the state ... in order to protect the interest of the state." N.Y. Exec. Law § 62(1). There is nothing in the law to suggest that the Attorney General has the authority to represent the City's legal interests or that the exclusive grant of authority to the Corporation Counsel in the City's Charter is subject to exceptions.

In practice, the interests of the City and the State are often different. They are frequently in litigation against one another, with the Attorney General representing interests adverse to those of the City. *See, e.g., City of New York v. Wing,* 94 N.Y.2d 466, 706 N.Y.S.2d 371, 727 N.E.2d 860 (N.Y.2000) (dispute between City and State over foster care expenditures); *Gross v. Perales,* 72 N.Y.2d 231, 532 N.Y.S.2d 68, 527 N.E.2d 1205 (1988) (dispute between City and State over public assistance expenditures); *City of New York v. New York State Dep't of Correctional Svcs.,* 237 A.D.2d 160, 655 N.Y.S.2d 5 (N.Y.App.Div.1997) (dispute between City and State over expenditures for State inmates in City jails); *cf. City of New York v. State,* 86 N.Y.2d 286, 631 N.Y.S.2d 553, 655 N.E.2d 649, 651–52 (N.Y.1995) (education suit brought by City against State in which the court held that municipalities lack the capacity to sue the State over matters affecting them in their governmental capacity).

In light of the substantial autonomy afforded New York City to deal with issues of local concern, and out of respect for the proper division of authority between the Corporation Counsel and the Attorney General to conduct the law business of the City and State respectively, it is appropriate to allow the City to continue with the instant suit notwithstanding the decision in *Sturm, Ruger.* The decision not to find the City in privity with the State is confined to the circumstances of this case. It does not stand for the proposition that the City may bring suit any time the State has not prevailed on a similar claim.

## IV. *Statement of a Claim*

### A. *Rule 12(b)(6) Standard and Scope*

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss for "failure to state a claim upon which relief may be granted." A defendant has the burden of proving "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40

L.Ed.2d 90 (1974). A court must accept the plaintiff's factual allegations as true, drawing all reasonable inferences in plaintiff's favor. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996).

In reviewing a Rule 12(b)(6) motion, the task of the court "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). Materials dehors the complaint are generally not considered on a motion to dismiss unless the court treats it as one for summary judgment, giving all the parties a reasonable opportunity to present relevant evidence under Rule 56. *See* Fed. R.Civ.P. 12(b)(6); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991). The complaint, however, is "deemed to include any written instruments attached to it as an exhibit or any statements or documents incorporated in it by reference." *Id.* at 47. "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002) (quotations and citation omitted).

Although an examination of evidence is normally not useful in deciding a motion to dismiss, it is desirable to briefly review ATF crime-gun trace data and the marketing practices of the gun industry in evaluating the legal sufficiency of this plaintiff's claims. A comprehensive review of such information was conducted, following extensive discovery and expert analysis, in *NAACP v. Acusport, Inc.,* 271 F.Supp.2d 435 (E.D.N.Y.2003) ("*NAACP* "). Preliminary examination of this material is prudent in light of recent cases interpreting New York law as requiring specific factual backgrounds in order to state a cause of action for public nuisance and negligence against the firearms industry. *See Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055, 1062–64 (2001) ("*Hamilton* ") (requiring a "tangible showing" of certain facts in order to impose a duty on members of the firearms industry to exercise reasonable care in the marketing and distribution of their handguns); *Sturm, Ruger,* Index No. 402586/00, at 26–27 (specifically noting facts which, if alleged, might be sufficient to state a cause of action for public nuisance against members of the firearms industry). Defendants rely on these cases in support of their assertion that New York law mandates dismissal of the City's public nuisance claim.

## B. *Stare Decisis and the Rule of Erie*

Under the rule of *Erie,* New York common law governs this case. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also NAACP,* 271 F.Supp.2d at 459. Federal courts in this state are bound to apply New York law of public nuisance as explicated by the New York Court of Appeals, the highest court in the State of New York and therefore the authoritative interpreter of New York law. They must apply the law "as interpreted by New York's intermediate appellate courts" unless they find "persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion." *Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 134 (2d Cir.1999).

This court is obliged to apply New York public nuisance law as announced and interpreted in the Appellate Division's decision in *Sturm, Ruger* and in the many other public nuisance cases considered by the New York courts. The law should not be determined mechanically, but rather, in

the context of "all relevant factors." *See Strubbe v. Sonnenschein,* 299 F.2d 185, 188 (2d Cir.1962). Also operative are the decisions of the New York Court of Appeals and those of the Court of Appeals for the Second Circuit in the *Hamilton* litigation. *See Hamilton v. Beretta U.S.A. Corp.,* 222 F.3d 36 (2d Cir.2000); *certifying questions to* 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001); *op. after certified question answered,* 264 F.3d 21 (2d Cir.2001). *Hamilton,* involving a negligence claim brought by private plaintiffs, will be considered to the extent it is relevant to the instant public nuisance suit.

## C. *Stating a Public Nuisance Claim against the Firearms Industry*

■ Under New York law, a claim for public nuisance may lie against members of the gun industry whose marketing and sales practice lead to the diversion of large numbers of firearms into the illegal secondary gun market. *See NAACP,* 271 F.Supp.2d at 449–51. In *NAACP* extensive discovery and detailed expert testimony demonstrated that gun manufacturers, importers and distributors were responsible for the creation of a public nuisance and that they could, voluntarily and through easily implemented changes, substantially reduce the harm occasioned by the illegal possession and use of handguns. *Id.* at 446; *cf. Sturm, Ruger,* Index No. 402586/00, at 26–27 (dismissing public nuisance claim before answers were filed or discovery was taken, but specifically noting facts which, if alleged, might be sufficient to state a cause of action). *Compare* other federal and state cases approving public nuisance claims against members of the firearms industry, *e.g., Ileto v. Glock,* 349 F.3d 1191 (9th Cir.2003); *White v. Smith & Wesson Corp.,* 97 F.Supp.2d 816 (N.D.Ohio 2000); *Chicago v. Beretta U.S.A. Corp.,* 337 Ill.App.3d 1, 271 Ill.Dec. 365, 785 N.E.2d 16 (2002); *Young v. Bryco*

*Arms,* 327 Ill.App.3d 948, 262 Ill.Dec. 175, 765 N.E.2d 1 (2001); *City of Gary v. Smith & Wesson, Corp.,* 801 N.E.2d 1222 (Ind. Dec.23, 2003); *Boston v. Smith & Wesson Corp.,* 2000 WL 1473568 (Mass.Super.Jul 13, 2000); *James v. Arms Tech. Inc.,* 359 N.J.Super. 291, 820 A.2d 27 (2003); *Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St.3d 416, 768 N.E.2d 1136 (2002); *Johnson v. Bulls Eye Shooter Supply,* 2003 WL 21639244 (Wash.Super.Jun 27, 2003); *Lemongello v. Will Co., Inc.,* 2003 WL 21488208 (W.Va.Cir.Ct. June 19, 2003), *with* federal and state cases disapproving public nuisance claims against industry members, *e.g., City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415 (3d Cir. 2002); *Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.,* 273 F.3d 536 (3d Cir.2001); *Ganim v. Smith and Wesson Corp.,* 258 Conn. 313, 780 A.2d 98 (2001).

### 1. *Existence of a Public Nuisance*

■ A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with the use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.,* 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968, 971 (1977) (citations omitted). The offense, "being one common to the public, should be enjoined at the suit of the sovereign's law officer." *New York Trap Rock Corp. v. Town of Clarkstown,* 299 N.Y. 77, 85 N.E.2d 873, 877 (1949); *see also New York State National Organization for Women v. Terry,* 886 F.2d 1339, 1361 (2d Cir.1989) ("[T]he City [of New York] is a proper party to bring an action to restrain a public nuisance that allegedly may be injurious

to the health and safety of its citizens."). Whether conduct "constitutes a public nuisance must be determined as a question of fact under all the circumstances." *New York Trap Rock Corp.*, 85 N.E.2d at 875.

The illegal possession and use of handguns in New York may constitute a public nuisance:

> There can be no dispute that the unlawful use of handguns constitutes a public nuisance ... Moreover, the injuries and deaths that result from such activities clearly constitute a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons.

*Sturm, Ruger,* Index No. 402586/00, at 20; *see also* N.Y. Penal Law § 400.05(1) ("Any weapon specified ... when unlawfully possessed, manufactured, transported or disposed of, or when utilized in the commission of an offense, is hereby declared a nuisance.").

### 2. Conduct of the Defendants Creating, Contributing to, or Maintaining the Nuisance

#### a. Conduct

##### i. Standard of Liability

In private nuisance cases, a plaintiff must prove fault by showing either intentional or negligent conduct on the part of the defendant or that the defendant engaged in ultrahazardous activity, justifying the imposition of strict liability. Restatement (Second) of Torts § 822. In public nuisance cases, in particular those brought by a public authority, allegations of fault have generally been found to be irrelevant under New York law. *See, e.g., State v. Shore Realty Corp.,* 759 F.2d 1032, 1051

(2d Cir.1985) (applying New York law); *United States v. Hooker Chem. & Plastics Corp.,* 722 F.Supp. 960, 965–66 (W.D.N.Y. 1989) (applying New York law); *State v. Fermenta ASC Corp.,* 160 Misc.2d 187, 608 N.Y.S.2d 980, 985 (N.Y.Sup.Ct.1994); *see also* Robert Abrams & Val Washington, *The Misunderstood Law of Public Nuisance: A Comparison with Private Nuisance Twenty Years After* Boomer, 54 Alb. L.Rev. 359, 373 (1990) ("New York courts have historically required no finding of negligence, intentional conduct, or an ultrahazardous activity in assigning liability for a public nuisance—the decisions carry with them the assumption that liability is strict."); *cf. NAACP,* 271 F.Supp.2d at 487 (in public nuisance action brought by private plaintiff, allegations of intentional or negligent conduct are necessary). While most of the cases in which allegations of fault were not required involved actions brought by the state concerning the release of hazardous wastes into the environment, the no fault rule also finds support in other public nuisance actions brought by a public entity. *See, e.g., City of Rochester v. Premises Located at 10–12 South Washington Street,* 180 Misc.2d 17, 687 N.Y.S.2d 523, 526 (N.Y.Sup.Ct.1998) (in action to have nightclub declared a public nuisance, owner could be held liable irrespective of fault or negligence). The absence of a fault standard is appropriate in the public nuisance context: "The public should not be made to suffer an unreasonable interference with its rights merely because the entity responsible for the interference is acting nonnegligently and without bad intent." Abrams & Washington, *supra,* at 370.

Judicial and scholarly opinions do not always distinguish between public and private nuisance. As a result, the fault concepts in private nuisance actions are sometimes superimposed onto public nuisance actions. *See id.* at 367–68. In a classic

public nuisance case, *Copart Indus. v. Consol. Edison Co.,* 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977), the court refers to "nuisance, either public or private, based on negligence," thus implying that traditional fault concepts apply to public nuisance. Abrams & Washington, *supra,* at 363–64 n. 31 (citing *Copart Indus.,* 394 N.Y.S.2d 169, 362 N.E.2d at 972). The Restatement, as well, has been criticized for improperly failing to distinguish between public and private nuisance in its suggestion, in the comment following the general rule of liability for private nuisance, that the law of public nuisance is the same in most circumstances. *See id.* at 367–68 (citing Restatement (Second) of Torts § 822, cmt. a).

Because the law on public versus private nuisances is unclear and because the New York Court of Appeals has never spoken definitively on whether traditional fault concepts are applicable in public nuisance suits, the concepts of intentionality and negligence require examination.

### ii. *Intentional Conduct*

A defendant acts intentionally if it acts for the purpose of causing an interference with a public right or knows that such interference was resulting or is substantially certain to result from its conduct. *See Copart Indus.,* 394 N.Y.S.2d 169, 362 N.E.2d at 972–73; *McKenna v. Allied Chem. & Dye Corp.,* 8 A.D.2d 463, 188 N.Y.S.2d 919, 924 (N.Y.App.Div.1959); Restatement (Second) of Torts § 825. A general awareness that harm is resulting or likely to result does not satisfy the intentionality requirement. *See Finch v. Swingly,* 42 A.D.2d 1035, 348 N.Y.S.2d 266 (N.Y.App.Div.1973); Restatement (Second) of Torts § 825, cmt. c. If a defendant becomes aware, however, that harm is resulting from its conduct and continues to act in the same manner, it may have acted with the requisite intent to contribute to a public nuisance. *See* Restatement (Second) of Torts § 825, cmt. d ("[W]hen the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional.").

The intentionality requirement in the context of the instant suit requires that a firearms "manufacturer, importer or distributor knows or is substantially certain that its marketing practices have a significant impact on the likelihood that a gun will be diverted into the illegal market and used in crime, and that substantial harm to the public will result." *NAACP,* 271 F.Supp.2d at 488; *see also id.* at 492 ("There is little difference between negligence as treated by the New York Court of Appeals in *Hamilton* and intent when defined as becoming aware that conduct is interfering with a public right and nevertheless continuing to engage in that conduct.").

The City asserts that the gun industry knows that the criminal market is fueled by its marketing and distribution practices. The complaint quotes the former Senior Vice President for Marketing and Sales for defendant Smith & Wesson:

> The company and the industry as a whole are fully aware of the extent of the criminal misuse of firearms. The company and the industry are also aware that the black market in firearms is not simply the result of stolen guns but is due to the seepage of guns into the illicit market from multiple thousands of unsupervised federal firearms licensees. In spite of their knowledge, however, the industry's position has consistently been to take no independent action to insure responsible distribution practices.

Another former industry insider is cited as testifying that ATF gun traces put the

industry on notice of problems with unsupervised dealers, but that such problems are not addressed because "if the industry took voluntary action, it would be admitting responsibility." Such allegations are sufficient to satisfy the liberal pleading requirements of the federal rules. *See* Fed.R.Civ.P. 8.

### iii. *Negligent Conduct*

 Negligent conduct may give rise to a public nuisance. *See Copart Indus. v. Consol. Edison Co.,* 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968, 972 (1977). Claims of public nuisance arising in part out of the negligent conduct of one or more defendants differ in some respects from a traditional cause of action for negligence. Where a nuisance is based on negligence, a plaintiff must still prove a duty of care and subsequent breach, but the duty at issue is to the public or to a substantial number of persons. *NAACP,* 271 F.Supp.2d at 490. Similarly, the circumstances under which a defendant may be found in breach of that duty differ as the number of persons affected, and therefore the foreseeability of the harm and unreasonableness of failing to act to prevent it, increases. *See id.* at 492 ("[W]here danger to the whole community is involved, the degree of seriousness with which reasonable entrepreneurs will seek to avoid the danger increases.").

 The New York Court of Appeals has not addressed the question whether gun manufacturers owe a duty to the public to exercise care in the marketing and distribution of their firearms. It has, however, considered whether gun companies owe a duty of care to individual victims of violence in the context of a negligence action. *See Hamilton,* 727 N.Y.S.2d 7, 750 N.E.2d at 1055. The *Hamilton* court's statements are instructive in considering whether a duty underlies the instant suit. It must be remembered, however, that *Hamilton* was an action by private plaintiffs seeking damages for past delicts, whereas the instant case seeks only an injunction to prevent future harm to the City of New York and its citizens.

The New York Court of Appeals in *Hamilton* held that persons killed by illegally obtained handguns are not owed a duty by handgun manufacturers to exercise reasonable care in the marketing and distribution of their handguns. *Id.* 727 N.Y.S.2d 7, 750 N.E.2d at 1066. It did not, however, bar all such negligence claims in the future, stating, "Tort law is ever changing; it is a reflection of the complexity and vitality of daily life ... Whether in a different case, a duty may arise remains a question for the future." *Id.* 727 N.Y.S.2d 7, 750 N.E.2d at 1068. The court predicated its decision on plaintiffs' inability to make a tangible showing that: (1) "defendants were a direct link in the causal chain that resulted in plaintiffs' injuries"; (2) "defendants were realistically in a position to prevent the wrongs;" or (3) there was any "statistically significant relationship between particular classes of dealers and crime guns." *See id.* 727 N.Y.S.2d 7, 750 N.E.2d at 1062, 1063 (emphasis omitted). Such a showing was necessary to ensure that there is no threat of a "specter of limitless liability." *Id.* 727 N.Y.S.2d 7, 750 N.E.2d at 1061. In different circumstances, the court suggested that a duty may be imposed under a theory of negligent entrustment: "[This] doctrine might well support the extension of a duty to manufacturers to avoid selling to certain distributors in circumstances where the manufacturer knows or has reason to know those distributors are engaging in substantial sales of guns into the gun-trafficking market on a consistent basis." *Id.* 727 N.Y.S.2d 7, 750 N.E.2d at 1064. Under the negligent entrustment doctrine, "[t]he possessor of a dangerous

instrument is under a duty to entrust it to a responsible person whose use will not create an unreasonable risk of harm to others. The duty may extend through successive, reasonably anticipated entrustees." *Id.* (citing *Rios v. Smith*, 95 N.Y.2d 647, 722 N.Y.S.2d 220, 744 N.E.2d 1156 (2001); *Splawnik v. DiCaprio*, 146 A.D.2d 333, 540 N.Y.S.2d 615 (N.Y.App.Div.1989); Restatement (Second) of Torts § 390). While the New York Court of Appeals found that "no such evidence was presented in *Hamilton*, 'a showing that specific groups of dealers play a disproportionate role in supplying the illegal market,' could support a finding of a duty of care with respect to other members of the gun industry dealing with those particular retailers." *NAACP*, 271 F.Supp.2d at 491 (quoting *Hamilton*, 727 N.Y.S.2d 7, 750 N.E.2d at 1064).

In *Sturm, Ruger*, the Appellate Division considered the concept of duty in the context of a public nuisance action. 761 N.Y.S.2d at 200–01. Although it noted that "the [New York] Court of Appeals seems reluctant to extend duties currently recognized between certain parties 'beyond that limited class of plaintiffs to members of the community at large,'" the court conceded that such a duty to the public may exist. *Id.* at 201 (quoting *Hamilton*, 727 N.Y.S.2d 7, 750 N.E.2d at 1061). Because it found, however, that "the duty which [the State's] complaint ultimately seeks to impose is similar to the one the *Hamilton* court unanimously rejected," it dismissed the suit on similar grounds. 761 N.Y.S.2d at 201.

Even if the City is required to plead a duty of care of the type developed in negligence actions and applied in *Hamilton*, it has done so. It alleges the existence of a corrupt group of firearms dealers with a disproportionate number of ATF crimegun traces and other trafficking-related indicators. It contends that the defendant manufacturers, importers and distributors know or have reason to know about these problem dealers, but continue to do business with them, thus facilitating the flow of illegally possessed guns into New York City. These allegations are sufficient to create an inference of duty of the type suggested in *Hamilton* under a theory of negligent entrustment. The complaint also contains sufficient factual allegations to make a tangible showing that defendants are a direct link in the causal chain that results in the harm to the City and the public occasioned by illegal gun use and that defendants are in a position to substantially reduce such harm. *See* Part IV.C.2.b.iii, *infra*.

iv. *Otherwise Lawful Conduct*

The fact that a defendant's conduct is otherwise lawful does not preclude liability for public nuisance. *See State v. Waterloo Stock Car Raceway, Inc.*, 96 Misc.2d 350, 409 N.Y.S.2d 40, 44–45 (N.Y.Sup.Ct.1978); 81 N.Y.Jur.2d, Nuisances § 61; *see also Sturm, Ruger*, Index No. 402586/00, at 22 ("[T]he lawful nature of a defendant's business and the nondefective condition of its product are significant but not necessarily determinative."). It is settled that an otherwise lawful business, even one operating in conformity with relevant statutory requirements, may be enjoined when it creates or contributes to a public nuisance because of the manner or circumstances in which it operates. *See e.g., New York Trap Rock Corp. v. Town of Clarkstown*, 299 N.Y. 77, 85 N.E.2d 873 (1949) (quarry operations); *Clawson v. Central Hudson Gas & Elec. Corp.*, 298 N.Y. 291, 83 N.E.2d 121 (1948) (dam); *Hoover v. Durkee*, 212 A.D.2d 839, 622 N.Y.S.2d 348 (N.Y.App.Div.1995) (auto racetrack); *Shaw's Jewelry Shop Inc. v. New York Herald Co.*, 170 A.D. 504, 156 N.Y.S. 651 (N.Y.App.Div.1915) ("automatic

baseball playograph"); *City of Rochester v. Premises Located at 10–12 South Washington St.,* 180 Misc.2d 17, 687 N.Y.S.2d 523 (N.Y.Sup.Ct.1998) (nightclub); *Town of Preble v. Song Mountain,* 62 Misc.2d 353, 308 N.Y.S.2d 1001 (N.Y.Sup.Ct.1970) (open air concert). The only exception is where the specific conduct at issue is "fully authorized by statute, ordinance or administrative regulation." Restatement (Second) of Torts § 821B, cmt. f; *see also Hill v. City of New York,* 139 N.Y. 495, 34 N.E. 1090, 1092 (1893) ("[T]he authority which will thus shelter an actual nuisance must be express ... For, consider what the proposition is. It upholds a positive damage to the citizen and denies him any remedy ... Surely, an authority which so results should be remarkably strong and clear.").

That the firearms industry is, in some respects, regulated at the federal, state and local level does not preclude the instant suit. Both federal and New York state firearms laws and regulations have expressly disavowed any preemptive effect on state common law. *See, e.g.,* 18 U.S.C. § 927 ("No provision of this chapter [Chapter 44—Firearms] shall be construed as indicating an intent on the part of Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together."); N.Y. Penal Law § 5.10(3) (penal laws pertaining to licensing of firearms and criminal negligence do "not bar, suspend, or otherwise affect any right or liability to damages, penalty, forfeiture or other remedy authorized by law to be recovered or enforced in a civil action"). In fact, many of the marketing and distribution practices of which the City complains remain almost wholly unregulated. *NAACP,* 271 F.Supp.2d at 485.

 The existence of a regulatory statutory scheme governing some aspects of the firearms industry does mean that the conduct alleged is fully authorized. *See Ileto v. Glock,* 349 F.3d 1191, 1214–15 (9th Cir.2003) ("[A]lthough gun manufacturing is legal and the sale of guns is regulated by state and federal law, the distribution and marketing of guns in a way that creates and contributes to a danger to the public generally ... is not permitted under law."); *City of Gary v. Smith & Wesson, Corp.,* 801 N.E.2d 1222, 1235 (Ind. 2003) ( [G]un regulatory laws leave room for the defendants to be in compliance with those regulations while still acting unreasonably and creating a public nuisance."). When a substantial interference with a public right is alleged, a court cannot, as a matter of law, deny judicial recourse to those who would try to enjoin it simply because it involves otherwise lawful commercial activity.

b. *Causation*

i. *Factual Cause*

 Satisfaction of the causation requirement for liability in public nuisance actions requires proof that a defendant, alone or with others, created, contributed to, or maintained the alleged interference with the public right. *See, e.g., Hine v. Aird–Don Co.,* 232 A.D. 359, 250 N.Y.S. 75, 77 (N.Y.App.Div.1931); *McNulty v. Ludwig & Co.,* 153 A.D. 206, 138 N.Y.S. 84, 91 (N.Y.App.Div.1912); *Sullivan v. McManus,* 19 A.D. 167, 45 N.Y.S. 1079, 1080 (N.Y.App.Div.1897). Whether specific acts or omissions meet this standard involves a fact-intensive inquiry, making it difficult to resolve the issue on a motion to dismiss on the pleadings. *See, e.g., Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 434 N.Y.S.2d 166, 414 N.E.2d 666, 670 (1980)

(noting in context of negligence action that issues of causation are generally for the fact finder to resolve).

Persons who join or participate in the creation or maintenance of a public nuisance are liable jointly and severally for the wrong and resulting injury. *See State v. Schenectady Chems. Inc.*, 103 A.D.2d 33, 479 N.Y.S.2d 1010, 1014 (1984) (citing *Simmons v. Everson*, 124 N.Y. 319, 26 N.E. 911 (1891)). Where it is difficult or impossible to separate the injury caused by one contributing actor from that caused by another and where each contributing actor's responsibility individually does not constitute a substantial interference with a public right, defendants may still be found liable for conduct creating in the aggregate a public nuisance if the suit is one for injunctive relief. *NAACP*, 271 F.Supp.2d at 493 (citing *Chipman v. Palmer*, 77 N.Y. 51, 1879 WL 12206 (1879)). Liability under such circumstances may be dependent on the actor's awareness of the other contributors' activities or the effect of their actions in the aggregate. Restatement (Second) of Torts § 840E, cmt. b.

The tortious actions or omissions of a defendant or defendants need not be the immediate cause of injury to the public. If a defendant's conduct "remains the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did," *United States v. Hooker Chems. & Plastics Corp.*, 722 F.Supp. 960, 968 (W.D.N.Y.1989) (citation omitted), it may be held liable for setting in motion or being a force in the sequence of events resulting in injury to the public. Intervening actions, even multiple or criminal actions taken by third parties, do not break the chain of causation if a defendant could reasonably have expected their nature and effect. *See, e.g., State v. Schenectady Chems. Inc.*, 103 A.D.2d 33, 479 N.Y.S.2d 1010, 1014 (N.Y.App.Div.1984) (chemical manufacturer may be liable for public nuisance even where it contracted with third party for disposal of chemical by-product wastes); *Caso v. District Council 37*, 43 A.D.2d 159, 350 N.Y.S.2d 173, 175, 178 (N.Y.App.Div.1973) (common law public nuisance action is "appropriate remedy" where illegal strike by public employees who serviced sewage treatment plants led to release of raw sewage into river; eventually it washed up onto beaches contaminating the water supply); *City of Rochester v. Premises Located at 10–12 South Washington St.*, 180 Misc.2d 17, 687 N.Y.S.2d 523, 527 (N.Y.Sup.Ct.1998) (nightclub owner could be held liable for off-premises conduct of his patrons upon leaving the club); *State v. Fermenta ASC Corp.*, 160 Misc.2d 187, 608 N.Y.S.2d 980, 985 (N.Y.Sup.Ct.1994) (lack of control over an herbicide at time injury to public occurred does not preclude public nuisance action against manufacturer).

### ii. *Proximate Cause*

Separate and apart from factual cause is the concept of proximate cause. Proximate cause embodies a policy requirement in some tort actions that a defendant's tortious conduct be causally sufficiently close to the harm suffered that it is just or fair to hold the defendant liable for the consequences of its actions. *See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235 (2d Cir. 1999) ("Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's liability only to those harms that have a reasonable connection to his actions."). The label proximate cause has occasionally been employed in public nuisance actions. *See NAACP*, 271 F.Supp.2d at 496 (citing pub-

lic nuisance cases but noting that they often involve more than one cause of action or are otherwise ambiguous). In such cases, "where the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases." *Id.* at 497.

### iii. *Causation in Suits Against the Firearms Industry*

 The possibility that, under some set of circumstances, a causal connection between harm suffered by the public and the conduct of members of the gun industry might be shown has not been precluded by the New York courts. In *Sturm, Ruger* the trial court, while finding that the harm alleged was too remote from defendants' conduct, explicitly left open the possibility that such a showing might be possible with advances in research and available data. Index No. 402586/00, at 26–27 ("In order to assert the broad liability suggested by the Complaint, plaintiffs must allege more facts which would demonstrate that defendants are somehow contributing to the handgun nuisance. This may become possible as further BATF investigations provide more information about the manufacture, sale and eventual unlawful use of handguns."). The Appellate Division affirmed, finding it "inappropriate *at this juncture* to sustain this complaint." 761 N.Y.S.2d at 200 (emphasis added).

Both the trial court and the Appellate Division in *Sturm, Ruger* relied in large measure on the decision of the New York Court of Appeals in *Hamilton,* 750 N.E.2d at 1055. In considering a negligence claim brought by individual gunshot victims against members of the firearms industry, the *Hamilton* court found that the causal connection between the harm suffered and the conduct of the defendants was too attenuated. *Id.* 727 N.Y.S.2d 7, 750

N.E.2d at 1062. It left open the possibility, however, that liability could be imposed upon "a tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries, and that defendants were realistically in a position to prevent the wrongs." *Id.*

There is now significantly more evidence available concerning (1) guns recovered by law enforcement agencies and traced by the ATF; (2) the marketing and distribution practices of members of the firearms industry and (3) the relationship of these marketing practices to crimes committed with guns in New York. In *NAACP,* extensive discovery and detailed expert testimony based upon ATF data and other material demonstrated that the defendant firearms manufacturers and distributors could be found to be a direct link in the causal chain resulting in injury to plaintiff, and that it might be found that defendants could, voluntarily and through easily implemented changes, substantially reduce the harm occasioned by the illegal use and possession of guns. 271 F.Supp.2d at 449–51. Evidence directly tying defendants' conduct to plaintiff's injuries could be found to have demonstrated that firearms manufactured, imported or distributed by defendants were acquired by straw purchases, at gun shows, as part of a multiple purchase, or sold by an indicted dealer, and diverted into the illegal market, causing injury or the threat of injury to the plaintiff. *Id.* at 509–10. The evidence further could be interpreted to have established that guns move relatively quickly from the legal to the illegal market and that a small number of dealers were responsible for most of the guns diverted to criminals. *Id.* at 522. This evidence led the court to conclude:

> The flow of guns into criminal hands in New York would substantially decrease if manufacturers and distributors insisted that retail dealers who sell their guns

be responsible—e.g., that they not sell at guns shows, but sell from the equivalent of a store front with a supply of stocked guns; that they not sell under a variety of names; that they protect against theft; that they train and supervise employees to prevent straw sales (which are often notoriously obvious to the seller); and that they take other appropriate and available protective action.

*Id.* at 450.

The City's complaint mirrors much of the evidence adduced at the *NAACP* trial. It alleges that defendants intentionally or negligently facilitate the diversion of substantial amounts of their guns into the criminal market. Diversion to criminals is allegedly accomplished as a result of, *inter alia,* defendants' failure to (1) monitor corrupt retailers; (2) require retail sales only through storefront establishments; (3) limit sales made at gun shows; (4) prohibit straw sales by retailers; (5) limit multiple sales to the same person; and (6) limit sales to dealers in states with lax gun laws. The complaint cites recent analyses of ATF trace data indicating that the pace of a gun's movement between the legal and illegal market is rapid. It further charges that defendants have failed to develop reasonable safeguards or to oversee and supervise their marketing and distribution schemes in order to prevent the foreseeable diversion of guns into criminals' hands. Although the chain of causation involves at least the manufacturer, distributor and first retailer, the City maintains that defendants exercise control over these marketing and distribution systems so that the apparent multiple links in the causal chain constitute, in actuality, one single link. Such specific factual assertions, alleging both spatial and temporal proximity between defendants' conduct and the illegal use and possession of firearms, are sufficient to survive a motion to dismiss on the pleadings.

It cannot be concluded, as a matter of law, that defendants' marketing and distribution practices are too remote from the injury to the public caused by the illegal possession and use of firearms. Given the City's assertion that defendants are a direct link in the causal chain resulting in the harm suffered by the public as a result of illegal gun use and that they are realistically in a position to prevent such harm, it is arguably appropriate to hold them accountable for their alleged tortious conduct. *See also, e.g., Ileto v. Glock,* 349 F.3d 1191, 1212–13 (9th Cir.2003); *White v. Smith & Wesson Corp.,* 97 F.Supp.2d 816, 823–25 (N.D.Ohio 2000); *Chicago v. Beretta U.S.A. Corp.,* 337 Ill.App.3d 1, 271 Ill.Dec. 365, 785 N.E.2d 16, 31 (2003); *Young v. Bryco Arms,* 327 Ill.App.3d 948, 262 Ill.Dec. 175, 765 N.E.2d 1, 18–19 (2001); *City of Gary v. Smith & Wesson, Corp.,* 801 N.E.2d 1222, 1240 (Ind.2003); *Boston v. Smith & Wesson Corp.,* 2000 WL 1473568, at *4–7 (Mass.Super.Jul 13, 2000); *James v. Arms Tech. Inc.,* 359 N.J.Super. 291, 820 A.2d 27, 39–41 (2003); *Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St.3d 416, 768 N.E.2d 1136, 1147–49 (2002).

### 3. *Statutory Nuisance Claim*

The City also asserts a claim for statutory nuisance on the basis of the New York Penal Law which provides, in relevant part: "Any weapon specified ... when unlawfully possessed, manufactured, transported or disposed of, or when utilized in the commission of an offense, is hereby declared a nuisance." N.Y. Penal Law § 400.05(1). This statute "amount[s] to a legislative declaration that the conduct proscribed is an unreasonable interference with a public right" and, as such, there is "no need for a court finding of unreasonableness." *See* Restatement (Second) of

Torts § 821B, cmt. c. The state trial court's dismissal of a similar statutory nuisance claim in *Sturm, Ruger*, Index No. 402586/00, at 29, which was not challenged on appeal, provides no basis for dismissing the City's claim in the instant suit. Dismissal in *Sturm, Ruger* was based on the complaint's failure to "adequately allege that defendants are liable for creating or maintaining a common law public nuisance." *Id.* Because the City has adequately pled a cause of action for common law public nuisance, its overlapping statutory claim need not be dismissed.

### V. *Commerce Clause and Due Process Clause*

#### A. *Commerce Clause*

As a bar to this action, defendants rely on the Commerce Clause, U.S. Const. art. I, sec. 8, cl. 1–3 ("The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States...."). They argue that the practical and inevitable effect of the City's suit is to regulate commerce beyond the borders of New York City and State, thus placing an impermissible burden on interstate commerce in violation of the Constitution.

 The Commerce Clause impliedly limits the power of the states to interfere with or impose burdens on interstate commerce. *W. & S. Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 652, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981). It "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)). Whether a particular state regulation interferes with interstate commerce to such an extent that it should be found to violate the Commerce Clause is essentially a matter of balancing the inconvenience to the national economy with the state's interest in protecting its own citizens: "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (citation omitted).

The applicability of the Commerce Clause to state common law actions is unsettled. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 573 n. 17, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (stating, in dicta, that Commerce Clause principles may apply to, at least, some civil suits). It should not be used to immunize out-of-state actors from the legitimate reach of a state's tort and nuisance doctrine. *See NAACP*, 271 F.Supp.2d at 464 ("The Commerce Clause is not designed to prevent individual states from protecting those within the state from tortious action by those engaged in commerce whose products or activities put the state's citizens at risk.") (citing *Berman Enters. Inc. v. Jorling*, 793 F.Supp. 408, 417 (E.D.N.Y.1992); *Tigue v. E.R. Squibb & Sons, Inc.*, 136 Misc.2d 467, 518 N.Y.S.2d 891, 897 (1987)). A court may protect those within the state from injuries inflicted by an out-of-state actor. *See, e.g., Young v. Masci*, 289 U.S. 253, 258–59, 53 S.Ct. 599, 77 L.Ed. 1158 (1933) ("The cases are many in which a person acting outside the State may be held responsible according to the law of the State for injurious consequences within it."); N.Y. CPLR 302(a)(3) (providing for exercise of personal jurisdiction over non-domiciliary who commits a tortious act without the state causing injury to person

within the state); *cf. BMW of North America, Inc. v. Gore,* 517 U.S. 559, 573, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (reversing award of punitive damages based on conduct that was lawful where it occurred and that had no impact on the state or its residents).

"Congress has expressly recognized that state regulation of the sale, possession, and use of guns are necessary complements to federal regulation of firearms." *NAACP,* 271 F.Supp.2d at 463 (citing 18 U.S.C. § 927); *see also C.D.M. Products, Inc. v. City of New York,* 76 Misc.2d 369, 350 N.Y.S.2d 500, 506–07 (N.Y.Sup.Ct.1973) (regulation of manufacture of cheap handguns known as "Saturday Night Specials" is proper exercise of City's police powers and does not violate Commerce Clause). State tort and nuisance doctrine aimed at protecting its citizens from the illegal use of firearms is similarly valid.

■ The City seeks to abate the allegedly tortious practices of the defendants in the marketing and distribution of their handguns which have an injurious effect on itself and its citizens. As a general matter, any burden placed on interstate commerce is outweighed by the substantial public interest in the regulation of the sale of firearms to protect the health and safety of New York City and its people. *NAACP,* 271 F.Supp.2d at 464; *see also City of Gary v. Smith & Wesson, Corp.,* 801 N.E.2d 1222, 1238 (Ind.2003); *Boston v. Smith & Wesson Corp.,* 2000 WL 1473568, at *11–14 (Mass.Super. July 13, 2000); *Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St.3d 416, 768 N.E.2d 1136, 1150 (2002). Objections that particular provisions of the injunctive relief requested place an impermissible burden on interstate commerce can be considered on a case-by-case basis in a subsequent phase of this litigation if it becomes necessary to do so.

### B. *Due Process Clause*

■ Defendants assert that the injunctive relief sought by the City would violate the Due Process Clause by attempting to regulate conduct outside its borders. According to the principle established in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 573, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Due Process Clause prevents a state from punishing conduct that was lawful where it occurred if it had no impact on the state or its residents. Principles of state sovereignty and comity do not bar any of the claims or relief sought in the instant suit. The City seeks relief for the harm imposed on itself and on those within its own borders.

### VI. *Conclusion*

The motion to dismiss is denied.

SO ORDERED.